WILLIAM PENN PARTNERSHIP, Robert M. Hoyt, Trustee Under Revocable Trust Agreement of Robert M. Hoyt dated 6/30/93, T. William Lingo, Bryce Lingo, J.G. Townsend, Jr. & Co., Beacon Revex, LLC, and Del Bay Associates, LLC, Defendants Below, Appellants,

v.

Anis K. SALIBA, Trustee Under Revocable Trust Agreement of Anis K. Saliba dated 6/27/91; and Rosa Ksebe, Trustee Under Revocable Trust Agreement of Kamal Ksebe Dated 5/22/85, Plaintiffs Below, Appellees.

No. 362, 2010.

Supreme Court of Delaware.

Submitted: Dec. 8, 2010.
Decided: Feb. 9, 2011.

Jeffrey M. Weiner, Wilmington, Delaware for appellants.

Peter J. Walsh, Jr. and Tye C. Bell of Potter Anderson & Corroon LLP, Wilmington, Delaware for appellees.

Before STEELE, Chief Justice, BERGER and RIDGELY, Justices.

STEELE, Chief Justice.

William Lingo and Bryce Lingo, through their ownership in the William Penn Partnership, breached their fiduciary duties to the members of Del Bay Associates, LLC when they facilitated the sale of the Beacon Motel, Del Bay's sole asset, under a deceptive and manipulative sales process. The Chancellor awarded Anis Saliba and Rosa Ksebe, members of Del Bay Associates to whom William Penn Partnership owed fiduciary duties, attorneys' fees because of the faithless prelitigation conduct of the William Penn fiduciaries. The Chancellor correctly found that the Lingos, acting for the William Penn Partnership, failed to meet their burden of establishing the entire fairness of the transaction because their prelitigation conduct rose to egregiousness and therefore, he did not abuse his discretion by awarding attorneys' fees.

## I. FACTS AND PROCEDURAL HISTORY

### The Parties

Anis K. Saliba, M.D., is a retired surgeon who lives in Lewes, Delaware. Saliba, in his capacity as trustee of the Revocable Trust Agreement of Anis K. Saliba, owned a one-sixth interest in Del Bay.

Rosa Ksebe lives in Lewes, Delaware and is a trustee of the Revocable Trust Agreement of Kamal Ksebe, her deceased husband. In her capacity as trustee of the Ksebe Trust, Ksebe also owned a one-sixth interest in Del Bay.

Robert Hoyt, as trustee of the Revocable Trust of Robert M. Hoyt, also owned a one-sixth interest in Del Bay. Hoyt resides in Maryland.

The William Penn Partnership owned the remaining one half interest in Del Bay. William Penn is a partnership organized and existing under the laws of the State of Delaware with its principal place of business in Rehoboth Beach, Delaware. T. William (Bill) Lingo, Bryce Lingo, and their mother, Margaret Lingo, each own a one third interest in William Penn. Bryce and Bill are its managing partners.

Jack Lingo, Inc. Realtor, a real-estate agency in Sussex County employs the Lingos. Bill and Bryce are both Vice Presidents of Jack Lingo and are brokers of record.

J.G. Townsend Jr. & Co. is a Delaware Subchapter S corporation with its principal place of business in Georgetown, Delaware. JGT is a landholdings and agricultural company. The Lingos, together with their two younger brothers, collectively own 40% of JGT and form a majority of its board of directors. The Lingos serve on the JGT board of directors, and Bryce is the Chairman.

Beacon Revex, LLC is a Delaware limited liability company that was formed on or about June 12, 2003 to serve as the exchange accommodation titleholder for JGT in connection with the purchase of the Beacon Motel. Bill Lingo is the sole manager of Beacon Revex.

### Background To Del Bay

Del Bay was originally formed in 1986 to construct a motel on land owned and contributed to Del Bay by Ksebe's now deceased husband. Del Bay also received capital contributions from the William Penn Partnership, Hoyt, and Saliba. The parties divided Del Bay ownership interests as described above.

They built the Beacon Motel in 1987 on a four acre site in Lewes, Delaware. It is a three story structure, housing 66 guest units. It is located adjacent to the shops of downtown Lewes. The first floor of the Motel houses small commercial tenants typical of a beach community. It operates on a seasonal basis from May through September. For the three years predating the challenged sale, the Beacon Motel generated a net income stream of approximately $250,000 for Del Bay.

Del Bay converted to a Delaware LLC pursuant to an Operating Agreement dated December 23, 1994. The ownership interests of the members of the LLC remained the same as the interest of each partner in the partnership. Under the LLC Operating Agreement, "all decisions and approvals of the members" required a vote of two thirds of the interests held by the members.[1] The Operating Agreement does not expressly eliminate any fiduciary duties. The Lingos were the initial managers, and the Lingos in fact remained the managers of Del Bay at all times relevant to this case. Under Article VII, the Oper-

---

1. Appendix to Op. Br. at A344.

ating Agreement provided a mechanism for members to dispose of their interest in Del Bay.[2] A member who wished to dispose of his interest could first offer it to Del Bay, and then, if not accepted by Del Bay within 45 days, to the other members, at a price "determined by the accountant regularly employed by the Company."[3] A nonselling member would have 30 days to purchase the disposing member's interest if Del Bay's option lapsed unexercised. If a member's offer to the Company or the other members lapsed or was waived, that member could then sell his interest to a third party.

Hoyt initially called periodic meetings of the members of Del Bay, but around 1998, Saliba and Ksebe had a falling out with the Lingos with respect to a real estate venture unrelated to this litigation. After the falling out, the Del Bay members ceased meeting together, and in July 2000, Hoyt contacted attorney James Griffin requesting an opinion concerning the disposition and or partition options for his ownership interest under the Operating Agreement. Hoyt indicated to Griffin that he was interested in selling his membership interest to Saliba and he asked whether two thirds of the members could force the sale of the Motel. Griffin "did not provide a clear answer" to the question of whether two thirds of the members could force a sale, but he did advise that under Article VII, any member who desired to dispose of their interest could do so by offering it to the Company and to the other members at the value determined by the Company's accountant. Hoyt, disappointed with Griffin's opinion, took no action. As of July 2000, neither Ksebe nor Saliba had any interest in selling the Motel.

Two offers to purchase the Motel property were presented to Del Bay before the Lingos decided to sell the entire property. In 2001, the Lingos declined an offer for $2 million, and in 2003, they declined an offer for $4 million. They never communicated either offer to Saliba or Ksebe.

### Lingos Decide To Sell

The Lingos eventually decided to end their business relationship with Saliba and Ksebe. In May 2003, they sought the advice of attorney Bob Thomas, who responded that the Motel property could be sold with the approval of two thirds of the members. Thomas also informed the Lingos that Article VII of the agreement provided a mechanism for members to sell their respective interests in Del Bay. The Lingos decided they could sell the property using the two thirds vote provision after obtaining Hoyt's approval.

To that end, the Lingos offered to sell the Motel to JGT,[4] recognizing the benefit to JGT because the Motel produced cash and the sale would allow JGT to take advantage of a Section 1031 tax free exchange under the Internal Revenue Code. To take advantage of a tax deferral from a previously sold piece of property, JGT needed to purchase a replacement property by April 2004. The Lingos told the JGT board that they had decided to pay $6 million for the property. They provided JGT's controller with financial information so that he could prepare a valuation for the JGT board. JGT's controller prepared the business valuation for Del Bay on May 23, 2003. At no time did anyone send this information to Saliba or Ksebe.

Contemporaneously, the Lingos called Hoyt and told him that they had decided to sell the Motel and that their attorney had

---

2. Appendix to Op. Br. at A346–51.

3. Appendix to Op. Br. at A346–48.

4. As noted above, the Lingos were 40% owners of JGT and controlled the Board of Directors.

advised them that they could sell the property with the vote of two thirds of the memberships' interests. The Lingos also told Hoyt they were working on a deal with JGT. On May 17, 2003, Hoyt received a prepared sales contract listing the Lingos and or their assignees as purchasers.

On May 19, Ksebe found a sales contract for the Motel in her mailbox. After Ksebe telephoned Saliba, he discovered a copy of the same sales contract in his mailbox. Attached to the contract was a note that read, "Mr. Hoyt has received a copy of the contract. Please call with questions." The contract listed the Lingos and or their "assigns" as purchasers, and indicated a purchase price of $6 million. The contract indicated that settlement "shall be completed" on or before June 30, 2003.

The timing of the sale particularly disconcerted Saliba and Hoyt because they were scheduled to be out of town the week after they received the Lingos' proposal and it came near the peak earning season for the Motel. However, on May 27, Saliba and Ksebe met with Griffin to discuss their options and gave him the signed Articles of Partnership (which had been superseded by the LLC Operating Agreement) because they could not locate a copy of the Operating Agreement.[5] During the meeting, they advised Griffin that they did not want the property sold and also expressed their desire to purchase the property in the event they could not stop its sale. Accordingly, that same day, Griffin faxed a letter to Hoyt and the Lingos indicating

Saliba and Ksebe's desire to purchase Hoyt's interest for $1 million and the Lingos' combined interest for $3 million. Ksebe and Saliba understood their offer to include assumption of the outstanding $625,000 mortgage on the property, although the faxed offer letter did not expressly state so.

On or about the same time on May 27, the JGT board was evaluating the Business Valuation prepared by its controller while considering purchasing the property. Two days later, the Lingos telephoned Griffin to express a willingness to accept Saliba and Ksebe's offer, but added the condition that the settlement must occur by June 30 for tax reasons related to a Section 1031 exchange. However, during this call, the Lingos did not advise Griffin that the Operating Agreement had superseded the Articles of Partnership referred to in his letter,[6] that they had received the advice of counsel regarding the legal requirements to sell the property, or that JGT was considering purchasing the property. Furthermore, stating that June 30 was the operative date for a Section 1031 tax exchange was a direct misrepresentation as in fact JGT had until April 2004 to benefit from the exchange.

After hearing from Griffin on May 29 about the Lingos' willingness to accept the offer, Saliba contacted Wilmington Trust and received adequate assurance of loan approval from a loan officer. Saliba then contacted Hoyt to inform him that Saliba and Ksebe would be willing to purchase

---

5. Saliba and Ksebe went to the office of David Baker, who drafted the Operating Agreement, but he was unable to produce a signed copy. It was later explained at trial that Hoyt forgot to circulate the signed copies of the Operating Agreement to the members of Del Bay. Appendix to Op. Br. at A215.

6. Interestingly, even though Hoyt showed Griffin a copy of the Operating Agreement in

2000, when he sought his advice in relation to his disposition and/or partition options in relation to Del Bay, Ksebe and Saliba apparently did not make Griffin aware of the Operating Agreement in 2003. The Chancellor found it important that the Lingos did not inform Griffin he was providing advice based on a superseded partnership agreement. *See* Appendix to Op. Br. at 228.

Hoyt's interest in Del Bay. June 2 and 3, Saliba and Hoyt both went out of town. The Lingos contacted Griffin on June 3, asked when a contract would be ready, and again misrepresented the significance of the June 30 date. Meanwhile, Saliba and Ksebe contacted Laurence Moynihan, an appraiser, to obtain a valuation of Del Bay to assure that the price was reasonable. Saliba explained to Hoyt that he was working to arrange financing and asked Hoyt to wait until June 11 before taking any action on the Lingos' proposal.

Hoyt informed the Lingos that Saliba and Ksebe's offer was superior because it included an assumption of the mortgage on the property. The Lingos then agreed to assume the mortgage. However, neither the Lingos nor Hoyt ever communicated this information to Saliba and Ksebe or their attorney, Griffin.

On June 10, 2003, the Lingos convinced Hoyt to sign the contract immediately so they could present it to the JGT board. The Lingos told Hoyt that if he did not sign the contract, JGT might back off. Hoyt signed the contract and faxed it to the Lingos. Neither Hoyt nor the Lingos contacted Saliba and Ksebe at that time to give them the opportunity to match or exceed the Lingo offer. On the same day, Moynihan gave Saliba and Ksebe a fairness opinion that valued the property at approximately $5.7 million. They believed this valuation to be low, but the appraisal did not dissuade them from pursuing the purchase.

The next day, Saliba tried to contact Hoyt to reconfirm his interest in purchasing Del Bay, but was unable to reach him. Saliba then contacted Del Bay's accountant to obtain valuation information. Only then did he learn that Hoyt had already signed the sales contract with the Lingos. Two days later, on June 12, the JGT board formally approved the purchase of the Beacon Motel. The Lingos assigned their rights to purchase the property to JGT.

Around June 23, JGT informed Griffin that the closing date was to be June 30, 2003. Four days later, Griffin contacted JGT's attorney, Dennis Schrader, to object to the sale and renew his clients' interest in negotiating a resolution to the dispute. Griffin also requested signed copies of the real estate sales contract and the Operating Agreement. The closing occurred on June 30, 2003. Saliba and Ksebe were not at the closing and no attorney was present to represent Del Bay's interests. At the closing, Bill Lingo signed a Del Bay resolution, falsely stating that at a special June 30 meeting the members of Del Bay "unanimously" authorized the sale of the Beacon Motel.

JGT financed the purchase of the Motel through a Wilmington Trust loan. Wilmington Trust requested an appraisal, which Hospitality Appraisals, Inc. conducted, and concluded the fair market value of the property as is was $5,060,000. This appraisal also noted that the highest and best use of the property was as a commercial development, but it did not value the property on that basis.

Because JGT purchased the Beacon Motel as an exchange property, they received a $1.6 million tax refund in 2004 pursuant to Section 1031 of the Internal Revenue Code. The Lingos' share was approximately $434,000 in total.

### PROCEDURAL HISTORY

Appellees Saliba and Ksebe filed an action for breach of fiduciary duty against the managers of Del Bay Associates, LLC, on December 12, 2003. The case went to trial on November 27–30, 2006 and the Court of Chancery held post trial arguments on July 20, 2007. On May 5, 2009, the Chancellor reassigned the case. On

May 14, 2009, the Chancellor issued a telephonic ruling holding that defendants failed to meet their burden of establishing the entire fairness of the sale. For the purpose of assessing damages, the Court directed the parties to select two experts who would be appointed to determine the value at which the property would likely have sold, on or about June 30, 2003, as a result of a fair bidding process in the open market in which all participants had the benefit of fair and accurate disclosure.

The experts opined that the market value of the Beacon Motel was $5.48 million. This figure was less than the price at which the Lingos orchestrated the sale to JGT. On April 12, 2010, the Chancellor issued his damage ruling—essentially awarding Appellees their attorneys' fees, experts' fees and costs.

## II. ANALYSIS

### A. *William Penn Partnership Failed to Establish Its Burden of Entire Fairness.*

 As an initial matter, we will only set aside the factual findings of the Court of Chancery if they are clearly wrong.[7] Our review of factual findings is deferential as long as "the findings are supported by the record and the conclusions are the product of an orderly and logical deductive process."[8]

 The parties here agree that managers of a Delaware limited liability company owe traditional fiduciary duties of loyalty and care to the members of the LLC, unless the parties expressly modify or eliminate those duties in the operating agreement.[9] The Del Bay Operating Agreement did not purport to modify or eliminate fiduciary duties and it named the Lingos as the managers of the LLC.[10] Therefore, as fiduciaries the parties here agree that the Lingos owe fiduciary duties of loyalty and care to the members of Del Bay. The Lingos here acted in their own self interest by orchestrating the sale of Del Bay's sole asset, the Beacon Motel, on terms that were favorable to them. By standing on both sides of the transaction—as the seller, through their interest in and status as managers of Del Bay, and the buyer, through their interest in JGT—they bear the burden of demonstrating the entire fairness of the transaction.[11]

 The concept of entire fairness consists of two blended elements: fair dealing and fair price.[12] Fair dealing involves analyzing how the transaction was structured, the timing, disclosures, and approvals.[13] Fair price relates to the economic and financial considerations of the transaction.[14] We examine the transaction as a whole and both aspects of the test

7. *Alaska Elec. Pension Fund v. Brown*, 988 A.2d 412, 418–19 (Del.2010).

8. *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 438 (Del.2000) (citing *Levitt v. Bouvier*, 287 A.2d 671, 673 (Del.1972)).

9. *Bay Ctr. Apartments Owner, LLC, v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *8 (Del. Ch. Apr. 20, 2009).

10. The Chancellor made these findings of fact in his opinion and neither party disputes them. *See* Appendix to Op. Br. at 223.

11. *Cole v. Kershaw*, 2000 WL 1206672, at *3 (Del.Ch. Aug. 15, 2000).

12. *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1162 (Del.1995).

13. *Id.*

14. *Solar Cells, Inc., v. True N. Partners, LLC*, 2002 WL 749163, at *5 (Del.Ch. Apr. 25, 2002).

must be satisfied;[15] a party does not meet the entire fairness standard simply by showing that the price fell within a reasonable range that would be considered fair.[16]

 Here, the Chancellor appropriately lacked confidence in the process. Because the Lingos procured the sale of the Beacon Motel without full disclosure to the other members of Del Bay, it is impossible to demonstrate that the sale was entirely fair, no matter what the price. The Lingos manipulated the sales process through misrepresentations and repeated material omissions such as (1) imposing an artificial deadline justified by "tax purposes;" (2) failing to inform Saliba and Ksebe that they were matching their offer by assuming the existing mortgage; (3) failing to inform Saliba and Ksebe that they had already committed to selling the property to JGT, an entity the Lingos controlled; (4) failing to inform Saliba and Ksebe that Hoyt signed the contract on June 10th and that the JGT board approved the purchase of the Beacon Motel on June 13th; (5) failing to inform Saliba, Ksebe and their counsel that the partnership agreement had been superseded and the Lingos had been advised by counsel of the requirements to sell the Beacon Motel under the LLC Agreement; and (6) failing to hold a vote on the transaction as required by the Operating Agreement, while falsely stating that the Del Bay members unanimously authorized the sale at a special meeting. Because the Lingos acted in their own self interest and contrary to the interests of other members of Del Bay, their actions precluded the possibility that the property would be sold pursuant to an open and fair process. Therefore, the Lingos failed to meet their burden of establishing fair dealing.

While fair dealing and fair price are distinct concepts, the burden to establish them is not bifurcated. Rather, this Court must evaluate a transaction as a whole to determine if the interested party has met his burden of establishing entire fairness.

The Lingos argue here that the deal was entirely fair because the purchase price was a premium to the appraisal price. JGT paid $6,625,000 for the Beacon Motel, which the Lingos contend was within the range of fairness based on numerous property valuations. First, Saliba and Ksebe requested a valuation report from Larry Moynihan. Moynihan valued the property between $5,176,000–$5,681,000 in June 2003. Next, Robert White performed a valuation at the request of Wilmington Trust, the mortgage lender for JGT. White valued the property "as is" at $5,060,000 as of August 2003. However, White concluded that the highest and best use of the improved portion of the property was not as a hotel or motel, but rather as a commercial development with mixed dwellings. Despite this assertion, White did not provide a valuation of the property as a commercial development. Also, Joe Melson, Jr. performed a valuation, at the request of Saliba and Ksebe, with an effective date of June 2006. Melson completed his valuation from the standpoint that the property's highest and best use included demolition of the existing improvements and redevelopment of the site with a mixed use building of commercial space and residential condominiums. Melson valued the property under those conditions in 2006 at $8,000,000.[17] After trial, the

15. *Cinerama*, 663 A.2d at 1162–63 (citing *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1361, 1371 n. 7 (Del.1995)).

16. *HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 116–17 (Del.Ch.1999).

17. The Chancellor elected not to rely upon this opinion when determining damages be-

Chancellor appointed independent experts[18] to determine the value at which the property would likely have sold as a result of a fair bidding process in the open market in which all participants had the benefit of full and accurate disclosure. The Court retained appraisal valued the property at $5,480,000.[19] Merely showing that the sale price was in the range of fairness, however, does not necessarily satisfy the entire fairness burden[20] when fiduciaries stand on both sides of a transaction and manipulate the sales process. Here, the Lingos manipulation of the sales process denied Saliba and Ksebe the benefit of knowing the price a fair bidding process might have brought.

The Court of Chancery had ample evidence on which to base its conclusion that the Lingos prevented a fair and open process by withholding full information, providing misleading information, and imposing an artificial deadline on the transaction. The Lingos' self interest in the transaction and their domination of the sales process tainted the entire transaction. Therefore, we hold that the record supports the Chancellor's factual findings and the Chancellor's conclusions are not clearly wrong.

## B. As a Matter of Law and Equity, the Court of Chancery Properly Awarded Attorneys' Fees and Costs.

■■■■■ We review awards of attorneys' fees for abuse of discretion.[21] We do not substitute our own notions of what is right for those of the trial judge if that judgment was based upon conscience and reason, as opposed to capriciousness or arbitrariness.[22] We also review awards for damages for abuse of discretion.[23]

■■■■■ Generally, under what is commonly known as the American Rule, "absent express statutory provisions to the contrary, each party involved in litigation will bear only their individual attorneys' fees no matter what the outcome of the litigation."[24] Nevertheless, the Court of Chancery has broad discretionary power to fashion appropriate equitable relief.[25] In fact, "where there has been a breach of the duty of loyalty, as here, potentially harsher rules come into play and the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly.... The strict imposition of penalties under Delaware law are designed to discourage disloyalty."[26]

cause Melson used a valuation date of June 2006, rather than June 2003. *See* Appendix to Op. Br. at 238.

**18.** Robert H. McKennon and Philip J. McGinnis

**19.** This appraisal asserted that the highest and best use of the property was continued use of hotel facility on approximately 2.1 acres fronting Savannah Road, with potential development of approximately 2.06 acres of excess land (including .54 acre of wetland) at the rear of property in accordance with current zoning.

**20.** *Gray*, 749 A.2d at 116.

**21.** *Mahani v. Edix Media Group, Inc.*, 935 A.2d 242, 245 (Del.2007).

**22.** *Dover Historical Soc'y, Inc. v. City of Dover Planning Comm'n*, 902 A.2d 1084, 1089 (Del. 2006).

**23.** *Int'l Telecharge, Inc.*, 766 A.2d at 440.

**24.** *Cantor Fitzgerald, L.P. v. Cantor*, 2001 WL 536911, at *4 (Del.Ch. May 11, 2001). *See also Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 545 (Del.1998).

**25.** *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 176 (Del.2002).

**26.** *Cantor Fitzgerald*, 2001 WL 536911 at *3 (quoting *International Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 441 (Del.2000)) (internal quotations omitted).

■ Saliba and Ksebe were left without a typical damage award because the Court's appraisal of the property came in at a value lower than the sale price. The Chancellor concluded it would be unfair and inequitable for Saliba and Ksebe to shoulder the costs of litigation arising out of improper prelitigation conduct attributable to the Lingos that amounted to a violation of their fiduciary duties. The Chancellor's decision to award attorneys' fees and costs was well within his discretion and is supported by Delaware law in order to discourage outright acts of disloyalty by fiduciaries.[27] Absent this award, Saliba and Ksebe would have been penalized for bringing a successful claim against the Lingos for breach of their fiduciary duty of loyalty.

Because the Court of Chancery based its decision to award attorneys' fees and costs on the faithless conduct of the Lingos, the decision was neither arbitrary nor capricious. The Court of Chancery based its decision on conscience and reason by upholding Delaware law and discouraging disloyalty.

## CONCLUSION

The Chancellor did not err by holding that the Lingos failed to meet the burden of establishing the entire fairness of a transaction on which they, as fiduciaries, stood on both sides. Furthermore, the Chancellor did not abuse his broad discretion in fashioning an equitable remedy and awarding Saliba and Ksebe attorneys' fees, expert expenses, and costs.

The judgment of the Court of Chancery is affirmed.

**27.** *See Cantor Fitzgerald,* 2001 WL 536911 at *2–4.