# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| BRANDYWINE DEVELOPMENT GROUP, L.L.C., a Delaware Limited Liability Company, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. N17C-08-059 MMJ |
| BRINKER RESTAURANT CORPORATION, a Virginia Corporation, | ) ) ) | |
| Defendant. | ) ) | |

Submitted: February 9, 2023
Decided: May 16, 2023

## POST-TRIAL OPINION

Jeffrey M. Weiner, Esq., Law Offices of Jeffrey M. Weiner, P.A., Wilmington, DE, *Attorney for Plaintiff*

Sharon Oras Morgan, Esq., Kasey H. DeSantis, Esq., Fox Rothschild LLP, Wilmington, DE, *Attorneys for Defendant*

**JOHNSTON, J.**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### *Background*

This is a contract dispute over a lease agreement (the "Lease") between

Brandywine Development Group ("BDG") and Brinker Restaurant Corporation

("Brinker Restaurant").[1]  BDG leased real property to Brinker Restaurant in Wilmington, Delaware to operate a Romano's Macaroni Grill restaurant location. The ten-year lease began on August 9, 1996, with options to renew for three five-year terms thereafter.  Article 26(b) of the Lease stated:

> No assignment or subletting or collection of Rent from the assignee or sub-tenant shall be deemed to constitute a novation or in any way release Tenant from further performance of its obligations under this lease, and Tenant shall continue to be liable under this Lease for the balance of the Primary Term and any Renewable Term with the same for an effect as if no such assignment had been made; provided, however, that Landlord shall be deemed to have released Tenant from all obligations accrued under this Lease prior to such assignment if Tenant's assignee has a net worth as of the date of assignment greater than or equal to Twenty Million and 00/00 Dollars ($20,000,000).

In June 2007, Brinker Restaurant renewed the lease for a five-year term.  On August 17, 2008, Brinker International, Inc. ("Brinker International") and MAC Acquisition LLC ("MAC") executed an Asset Purchase Agreement (the "APA").  Brinker International is the parent company to Brinker Restaurant.  The APA outlined MAC's purchase of 225 Romano's Macaroni Grill restaurants and brand assets from Brinker International for $131.5 million—later amended to approximately $87.8 million (the "Acquisition").

---

[1] Brinker Restaurant Corporation's predecessor entity is Brinker Delaware, Inc.  The Court will collectively refer to Brinker Restaurant Corporation and Brinker Delaware, Inc. as "Brinker Restaurant."

In conjunction with the Acquisition, MAC sold 39 Macaroni Grill sites to three third parties for approximately $76 million in a sale-and-leaseback transaction (the "Sale-and-Leaseback Transaction").[2] Brinker International received approximately $72 million in net proceeds after various charges and deductions.[3] Because the Sale-and-Leaseback Transaction occurred at the same time as the Acquisition, the third parties paid the sale proceeds directly to Brinker on behalf of MAC. After taking into account various agreed-upon costs and prorations, the total cash payment owed to Brinker to close the Acquisition was approximately $82 million.[4] Thus, after Brinker International received the $72 million from the third parties on behalf of MAC, MAC had approximately $10 million remaining balance due to Brinker International, which MAC paid on December 18, 2008.[5] The Final Closing Statement represents the exact figures.[6]

On September 5, 2008, Brinker International notified BDG that Brinker Restaurant would assign the Lease to MAC.[7] On November 30, 2008, BDG and Brinker Restaurant executed the Landlord's Recognition of Assignment and

---

[2] JX 24 (Seller's Statement).
[3] *Id.*
[4] JX 21 (showing the Aggregate Cash Paid to Seller at Closing).
[5] JX 29 (showing a wire transfer debit for $9,997,279.50 to Brinker International on December 18, 2008 on MAC's Silicon Valley Bank reconciliation); *see also* JX 30 (summarizing December 2008 transactions from MAC's Silicon Valley Bank account).
[6] JX 21.
[7] JX 14.

Estoppel Agreement ("Landlord's Recognition").[8]  Under the Landlord's

Recognition, BDG recognized MAC as the tenant under the lease.  However, the

Landlord's Agreement did not state that Brinker Restaurant was released from the

lease.  Paragraph 11 of the Landlord's Recognition stated that Brinker International

"reaffirm[ed] for [BDG] each and every agreement, covenant and obligation set

forth in the Guaranty of Lease."[9]

On December 18, 2008, the Acquisition closed.  In conjunction with the

Acquisition, Golden Gate Private Equity, Inc. ("Golden Gate") and Brinker

Services Corporation ("Brinker Services") entered into the Mac Parent LLC

Limited Liability Company Agreement (the "Mac Parent LLC Agreement").[10]  The

Mac Parent LLC Agreement required that Brinker Services and Golden Gate

contribute a combined $31 million for a membership interest (the "$31 million

Contribution") in MAC's parent company ("Mac Parent").  Section 1.3 of the APA

also states:

> At Closing, [Brinker Services] will contribute to [Mac]
> Parent $6,000,000 in [Brinker Services'] cash in
> consideration . . . for 19.9% of each class of [Mac]
> Parent's membership interests issued and outstanding as
> of the Closing, and one or more Affiliates of [Golden
> Gate] will contribute to [Mac] Parent cash in an amount of
> $25,000,000 . . . in consideration for 80.1% of each class
> of [Mac] Parent's membership interests issued and

---

[8] JX 17.
[9] JX 17, Brinker 0072–73.
[10] JX 20.

4

outstanding as of the Closing. At Closing, (i) [Mac] Parent shall contribute the [Brinker Services] Contribution and [Golden Gate] Contribution to [Mac Holding, LLC ("Holdco")] in consideration for 100% of the equity interest in Holdco and (ii) Holdco shall contribute the [Brinker Services] Contribution and [Golden Gate] Contribution to [MAC] in consideration for 100% equity interest in [MAC].[11]

On December 18, 2008, Brinker Restaurant assigned to MAC all its "rights, duties, obligations, and liabilities under the Lease" through the Assignment and Assumption of Lease Agreement (the "Assignment").[12] BDG was notified of the Assignment via cover letter with the enclosed Assignment.[13] After the Assignment, MAC acted as the tenant under the Lease.

In January 2009, Brinker International requested a balance sheet with a date and certification. At the end of January 2009, MAC sent its Estimated Opening Balance Sheet—Unaudited ("EOBS"). MAC's Vice President of Finance and Development certified the EOBS.[14] MAC later produced the Updated Balance Sheet.[15] Both the EOBS and the Updated Balance Sheet reflect MAC's net worth as $31 million on December 18, 2008.

---

[11] JX 10.
[12] JX 25, Brinker 0077.
[13] *Id.* at Brinker 0076.
[14] JX 26.
[15] JX 27.

5

In June 2012, MAC renewed the Lease for another five years. Around June 2017, MAC stopped making rent payments under the Lease. On August 4, 2017, BDG filed the instant action against MAC and Brinker Restaurant. On April 8, 2020, BDG voluntarily dismissed MAC from the suit.

The primary issue before the Court is whether MAC had a net worth of $20 million or more as of the date of the Assignment (December 18, 2008). BDG has made several arguments pertaining to MAC's financial position after December 18, 2008. However, the Lease explicitly states that the net worth is to be measured as of the day of the Assignment, December 18, 2008. Thus, MAC's financial position as of December 18, 2008 is the only relevant financial accounting necessary to determine if Brinker was released from its obligations under the Lease. MAC's net worth and other financial transactions after December 18, 2008 are not relevant to determine whether Brinker Restaurant is released from its obligations under the Lease. The Lease could have required the assignee to maintain a $20 million net worth for a period of time before and/or after a release became effective. However, the Lease does not contemplate that scenario. The Lease specifically designates the assignee's net worth as of the December 18, 2008 Assignment date.

If MAC's net worth was equal to or greater than $20 million on December 18, 2008, then under the Lease, Brinker Restaurant was no longer liable for rent payments after that date. MAC produced two balance sheets (the EOBS and the

6

Updated Balance Sheet) showing its net worth was more than $20 million on December 18, 2008. BDG has attempted to discredit those balance sheets. The parties tried their non-jury case on November 14–15, 2022. The trial was limited to documentary evidence and expert testimony.

### *Estoppel*

Brinker Restaurant outlined the various forms of estoppel in its briefing:

> Estoppel comes in multiple forms—(i) judicial estoppel, which "serves to prevent a party . . . from asserting in a legal proceeding a position inconsistent with a position previously taken by [that party] in the same or in an earlier legal proceeding," *Nationstar Mortg., LLC v. Crane*, 2015 WL 412936, at *2 (Del. Super.) (citation omitted); (ii) quasi-estoppel, which "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position it has previously taken," *Pivotal Payments Direct Corp. v. Planet Payment, Inc.*, 2020 WL 7028597, at *4 (Del. Super.); and (iii) equitable estoppel, which "involves a party that by his conduct intentionally or unintentionally leads another to change position to his detriment in reliance upon that conduct." *Id.*[16]

"Equitable estoppel will prevent the exercise of an otherwise unquestioned contract right where the Plaintiff has been misled and induced to sign to his prejudice by a misrepresentation before execution."[17]

BDG contends that Brinker Restaurant is estopped from arguing release because: (1) as part of the 2008 negotiations for the Landlord's Recognition,

---

[16] Def.'s Answering Br. 42.
[17] *Reeder v. Sanford Sch., Inc.*, 397 A.2d 139, 142 (Del. Super. 1979).

7

Brinker International led BDG to believe that Brinker International was still guaranteeing the Lease;[18] (2) Brinker Restaurant's cover letter that enclosed copies of the Assignment did not state that Brinker Restaurant was released from its obligations under the Lease due to MAC's net worth; (3) MAC's notice to Brinker Restaurant/International stating that MAC intended to renew the Lease a second time showed that MAC did not consider Brinker Restaurant released from the Lease; and (4) a letter dated August 21, 2017 prevents Brinker Restaurant from relying upon the Updated Balance Sheet to establish MAC's net worth.[19]

*Reliance Upon Landlord's Recognition Negotiations*

The 2008 negotiations of the Landlord's Recognition show BDG proposed the following language for paragraph 11:

> 11. Guaranty. Brinker International, Inc. has signed this Certificate in part to acknowledge and agree that, notwithstanding the assignment of the Lease, it continues to be bound by the Guaranty (attached to the Lease as Exhibit J) and to serve as guarantor for the Lease as assigned to [MAC].[20]

Brinker International replied with the following comments regarding paragraph 11:

---

[18] *See* JX 16 (showing the proposed changes to paragraph 11 of the Landlord's Recognition before arriving at the final language).

[19] The Court notes that the parties mention all three forms of estoppel. However, the only form of estoppel applicable to BDG's arguments is equitable estoppel. BDG fails to clarify which estoppel it claims applies to each category of argument.

[20] JX 16.

Section 11—Guaranty: We have included language reaffirming all agreements, covenants and obligations set forth in the Guaranty. It is substantially similar to the language you provided us, but we have already received approval for this language from the Purchaser's counsel and in the interest of expediency have inserted it to the Consent.[21]

Brinker International inserted, and BDG accepted, the language for paragraph 11 stating that Brinker International "reaffirm[ed] for [BDG] each and every agreement, covenant and obligation set forth in the Guaranty of Lease."[22] BDG also contended the fact that Brinker International had to obtain approval from MAC regarding the language of paragraph 11 precludes Brinker Restaurant from arguing release.

The Court finds that the negotiations between Brinker International and BDG leading up to the fully executed Landlord's Recognition do not estop Brinker Restaurant from arguing release. The negotiations provide insufficient evidence to establish an equitable estoppel argument. The guaranty provisions at issue only imposed obligations upon Brinker International, and not Brinker Restaurant.[23] Both Brinker International and BDG were sophisticated parties negotiating the Landlord's Recognition. Brinker International's assertion of pre-approved language did not make any misrepresentation. BDG's proposed language, and

---

[21] *Id.*
[22] JX 17, Brinker 0072–73.
[23] JX 5, Brinker 0056–57; JX 17, Brinker 0072–73.

9

Brinker International's response, both denote a standard sequence of negotiations one would expect between sophisticated parties contemplating contract language. Both Brinker International and BDG accepted the language in paragraph 11 as reflected in the fully executed version of the Landlord's Recognition.[24] The fully executed Landlord's Recognition does not contain language that would prevent Brinker Restaurant from arguing release.

*Reliance Upon Brinker Restaurant's*
*Cover Letter and the Assignment*

Brinker Restaurant sent a copy of the Assignment to BDG on December 18, 2008.[25] The Assignment was an agreement entered into between Brinker Restaurant and MAC. BDG was not a party to the Assignment. The Assignment stated:

> 2) Modification. Assignee [MAC] shall not amend or modify the Lease, without Assignor [Brinker Restaurant]'s prior written consent, which consent shall be conditioned upon Assignee [MAC] causing Landlord [BDG] to full release Assignor [Brinker Restaurant] (and each of Assignor [BDG]'s subsidiaries that has any continuing liability under the Lease) from any and all liability under such Lease . . . .[26]

---

[24] JX 17, Brinker 0072–74.
[25] JX 25, Brinker 0077.
[26] *Id*. The Court notes that very similar language also existed in Section 1.1(c)(iii) of the APA. JX 10, Brinker 0104.

10

The Court finds that it was not reasonable for BDG to rely on Brinker Restaurant's cover letter and the Assignment to conclude Brinker Restaurant was not released from the Lease. The Lease does not require that Brinker Restaurant notify BDG that it considers itself released from the Lease for the release to become effective. The Landlord's Recognition required that Brinker Restaurant forward a copy of the Assignment to BDG.[27] While the language of the Assignment insinuates that Brinker Restaurant has not yet been released from the Lease, BDG is not a party to the Assignment. The Assignment does not modify the language of the Lease. The Lease provides the conditions under which Brinker Restaurant would be released from the Lease. Therefore, the doctrine of equitable estoppel does not apply to BDG's reliance on Brinker Restaurant's cover letter and the Assignment.

*Reliance Upon MAC's Notice of Second Renewal*

MAC notified Brinker Restaurant/International[28] that MAC intended to renew the Lease a second time. BDG argues this notification implied MAC considered Brinker Restaurant not to have been released from the Lease.

---

[27] JX 17, Brinker 0070 ("An executed copy of the Assignment and Assumption of Lease shall be forwarded to Landlord after the Effective Date pursuant to the terms of the Lease").
[28] The Court notes it is unclear whether MAC notified Brinker Restaurant or Brinker International. However, the difference is not material.

However, MAC was required to notify Brinker Restaurant when it chose to exercise its right to renew the Lease.[29]

The Court finds it was not reasonable for BDG to rely upon MAC's notice of its second renewal to conclude Brinker Restaurant was not released from the Lease. Therefore, the doctrine of equitable estoppel does not apply to MAC's notice of second renewal.

*Reliance Upon a Letter Dated August 21, 2017*

On August 21, 2017, Brinker Restaurant's corporate counsel sent a letter to BDG's counsel asking Brinker Restaurant to dismiss Brinker Restaurant from the case because Brinker Restaurant had been released from the Lease.[30] The letter enclosed a copy of the EOBS, but not the Updated Balance Sheet.[31] Brinker Restaurant later found the Updated Balance Sheet through the normal course of discovery.

The Court finds it was not reasonable for BDG to rely upon the August 21, 2017 letter to conclude Brinker Restaurant was not released from the Lease. Brinker Restaurant may use the Updated Balance Sheet to argue release. Brinker

---

[29] JX 25, Brinker 0078 ("Assignee [MAC] shall provide Assignor [Brinker Restaurant] written notice of each such exercise promptly after Assignee [MAC] provides the applicable landlord notice of such exercise.").
[30] JX 47.
[31] *Id.*

Restaurant found and provided the Updated Balance Sheet in the normal course of discovery.

### *Burden of Proof*

The party seeking to enforce a contract bears the burden of proving a breach of contract by a preponderance of the evidence.[32]

"Delaware courts recognize the validity of general releases."[33]  A party seeking to nullify a contracted release due to fraud, duress, coercion, or mutual mistake typically bears the burden of proof by clear and convincing evidence.[34] The Court of Chancery explained that the party seeking to avoid a finding of breach of contract bears the burden of proof when the contractual language establishes a condition subsequent:

> Where a contractual obligation is subject to what was traditionally referred to as a "condition subsequent," or what the Restatement (Second) of Contracts § 230 refers to as "Event that Terminates a Duty," that obligation exists unless it is extinguished by the occurrence of a contractually specified event.  In that situation, the party

---

[32] *Zimmerman v. Crothall*, 62 A.3d 676, 691 (Del. Ch. 2013).

[33] *Riverbend Cmty., LLC v. Green Stone Eng'g, LLC*, 2012 WL 1409013, at *6 (Del. Super.), *aff'd*, 55 A.3d 330 (Del. 2012) (citing *Adams v. Jankouskas*, 452 A.2d 148, 155 (Del.1982)).

[34] *Id.* ("Where the language of the release is clear and unambiguous, it will only be set aside 'where there is fraud, duress, coercion, or mutual mistake concerning the existence of the party's injuries.'  The party seeking to nullify the release bears the burden of demonstrating by clear and convincing evidence that the release is invalid." (citing *Edge of the Woods v. Wilmington Sav. Fund Soc'y, FSB*, 2001 WL 946521, at *4 (Del. Super.)); *see also Seven Invs., LLC v. AD Cap., LLC*, 32 A.3d 391, 396 (Del. Ch. 2011) ("When a plaintiff asserts that the release itself was induced by the defendant's fraud, 'the party seeking enforcement of the release bears the burden of proving that the released fraud claim was within the contemplation of the releasing party.'" (quoting *E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 461 (Del. 1999))).

seeking to avoid a finding of breach bears the burden of proving that the event has occurred and its obligation was extinguished.[35]

The Court finds Brinker Restaurant bears the burden of proving by a preponderance of the evidence that MAC's net worth was equal to or greater than $20 million. Under the Lease, the net worth requirement is a condition subsequent that would terminate Brinker Restaurant's duties under the Lease. Brinker Restaurant is "seeking to avoid a finding of breach."[36] Thus, to absolve itself from liability under the Lease, Brinker Restaurant must demonstrate by a preponderance of the evidence that MAC's net worth was equal to or greater than $20 million on December 18, 2008.[37]

### *Net Worth Versus Fair Market Value*

BDG's expert stated in his first report that net worth may mean fair market value:

> Net worth is the value of the company derived by subtracting liabilities from the current value of the company's assets. Net worth is more than simply taking

---

[35] *S'holder Representative Servs. LLC v. Shire US Holdings, Inc*., 2020 WL 6018738, at *18 (Del. Ch.), *aff'd*, 267 A.3d 370 (Del. 2021) (internal citations removed); *see also Ewell v. Those Certain Underwriters of Lloyd's, London*, 2010 WL 3447570, at *3 (Del. Super.) ("The burden of allegation and proof of a condition precedent is on the plaintiff, while the burden of proof and allegation of a condition subsequent is on the defendant.").

[36] *S'holder Representative Servs.*, 2020 WL 6018738, at *18.

[37] *Id.*; *Channel Medsys., Inc. v. Boston Sci. Corp*., 2019 WL 6896462, at *16 (Del. Ch.) (concluding the party seeking to terminate its obligations under a contract "bears the burden of 'proving by a preponderance of the evidence the facts supporting the exercise of its termination rights'" (quoting *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *4 (Del. Ch.), *aff'd*, 198 A.3d 724 (Del. 2018))).

14

assets and subtracting liabilities. It is a question of whether the company in its current form will sell or be liquidated for more than twenty million [dollars].[38]

When analyzing BDG's expert's first report, Brinker Restaurant's expert references fair market value as a measure of net worth when she stated: "Brinker invested $6 million in M[AC] in return for a 19.9% stake in M[AC]. Based on just this piece of the total transaction, M[AC] had a fair market value (i.e., net worth) of $30.15 million."[39] BDG's expert contends in his second report that MAC's book value (assets less liabilities) is what the Lease contemplates as "net worth."[40] BDG's expert endorsed the book value definition of net worth at trial.[41]

The Court finds that net worth, as contemplated by the Lease, is not synonymous with fair market value. Rather, net worth, as contemplated by the Lease, is the book value of MAC's assets less liabilities as of December 18, 2008. Multiple methods exist to determine the fair market value of a company. Fair market value is subjective. A buyer determining fair market value of a company may consider other factors external to the assets and liabilities of the company. For instance, a buyer may be willing to pay substantially more than the book value

---

[38] JX 57, 3.
[39] JX 64, 7.
[40] JX 66, 5–6.
[41] Def.'s Post-Trial Opening Br. 18–19, n.10 (citing Tr. 1 (Langdon), 76:4–5). The Court notes that it appears Brinker Restaurant's expert appears to have mentioned the fair market value definition of net worth in response to BDG's expert's inclusion of fair market value in his definition of net worth.

15

for a company on the basis of the company's anticipated future revenue, which is not yet reflected on its balance sheet.

While the language in the Lease does not define net worth, "property owners are interested in the solvency of the corporation, [the corporation's] ability to pay [its] obligations as they come due, [and the corporation's] ability to survive unexpected needs and invest in new projects."[42] The Lease contemplates the net worth at the time of the Assignment. The balance sheet, and the net worth reflected on the balance sheet, are a snapshot of the company's financials on a specific date. Fair market value is a subjective analysis, whereas book value can be determined through established accounting methods as of a given day. Therefore, MAC's book value (*i.e.*, assets less liabilities as reflected on a balance sheet) will control the Court's analysis of its net worth, rather than estimates of MAC's fair market value (*i.e.*, the amount a buyer may be willing to pay for MAC).[43]

---

[42] JX 66, 6 (BDG's expert's Updated Report on Calculation for Brandywine Development Group).

[43] The Court has considered the arguments regarding MAC's purchase of 255 Macaroni Grill sites for approximately $88 million and the $31 million Contribution. Brinker Restaurant argues these amounts reflect MAC's fair market value being more than $20 million. The Court only considers these arguments in the context of how these transactions impacted MAC's net worth, as reflected on MAC's balance sheets.

### *Brinker Restaurant's Expert Opinion and Arguments*

Brinker Restaurant submitted an expert report,[44] and the expert testified at trial. Brinker Restaurant's expert opined MAC's net worth was $31 million, as of December 18, 2008. To support this, Brinker Restaurant relied upon both the EOBS and the Updated Balance Sheet. The expert testified that Brinker International's accounting team prepared the Updated Balance Sheet in March 2009. Further, the Updated Balance Sheet is more accurate than the EOBS[45] because: (1) it was more likely to have been prepared in accordance with GAAP; and (2) it was prepared after performing a purchase price allocation.

Brinker Restaurant contends that the Updated Balance Sheet was prepared in compliance with GAAP because: (1) the Updated Balance Sheet contains elements that show it was prepared on an accrual basis (a GAAP requirement); and (2) Section 3.7 of the Transition Services Agreement ("TSA")[46] required Brinker International's accounting services to "supply the Accounting Services to MAC with respect to the Operating Restaurants in substantially the same manner and at substantially the same level of performance as Brinker [International] supplied such services to the Operating Restaurants prior to the [Acquisition]."[47] As a

---

[44] JX 64.
[45] Tr. 1 (Smith), 178:19–179:1.
[46] JX 19.
[47] *Id.* at Brinker 0182.

public company, Brinker Restaurant's expert testified Brinker International was required to implement GAAP in its own financial reporting.[48] This suggests, based on the TSA, that Brinker International's accounting services implemented GAAP when preparing Brinker Restaurant's Updated Balance Sheet.

Brinker Restaurant's expert explained that the Updated Balance Sheet "was prepared following both the completion of the true-ups contemplated by Sections 1.4 and 1.5 of the APA and the completion of a purchase price allocation as required by Section 1.6 of the APA."[49] "[A] purchase price allocation is an accounting exercise that takes the total amount of a purchase price pursuant to a transaction and allocates the total price to individual assets if not already designated in the purchase documents."[50] Brinker Restaurant's expert explained that differences between the EOBS and the Updated Balance Sheet exist because: (1) the EOBS is estimated; (2) the Updated Balance Sheet "more precisely records [MAC's financials] after having done the purchase price accounting;"[51] and (3) the

---

[48] *See* Tr. 1 (Smith), 170:17–23.
[49] Def.'s Opening Br., 21 (citing Tr. 1 (Smith), 173:2–176:7); *see also* Tr. 1 (Smith), 178:19–179:1 (opining that the Updated Balance Sheet is "a balance sheet that clearly reflects a purchase price allocation on GAAP basis, the allocation of tangible and intangible assets and reflects the actual cash balance in the bank accounts with the appropriate accruals for the transaction fees that are going to be paid out"). The Court also notes that the true-ups were contemplated by Section III of the Final Closing Statement. JX 21, 2.
[50] Def.'s Opening Br., 22 (citing Tr. 1(Smith), 194:8–1, 178:19–179:1).
[51] Tr. 1 (Smith), 173:2–5.

18

Updated Balance Sheet also takes the true-ups contemplated by the Final Closing Statement into consideration.[52]

Brinker Restaurant's expert also opined that the EOBS supports the proposition that MAC had a net worth equal to or greater than $20 million. Brinker Restaurant's expert explained that even though it was an estimated balance sheet prepared prior to the completion of the purchase price allocation, it was further supporting evidence that MAC had a net worth in excess of $20 million. However, the EOBS is less reliable than the Updated Balance Sheet.[53]

Brinker Restaurant also argues the approximately $88 million sale to MAC, and the $31 million Contribution, show MAC's fair market value was more than $20 million. However, the Court only considers these arguments in the context of how these transactions impacted MAC's net worth, as reflected on MAC's balance sheets. Even though the net price MAC ultimately paid to Brinker International was around $10 million, Brinker Restaurant contends MAC's assets on December 18, 2008 may be substantially larger than $10 million because the overall sale was for nearly $88 million. Brinker Restaurant contends the EOBS and Updated Balance Sheet properly reflect the Transaction, together with the sale-and-leaseback transaction, on December 18, 2008.

---

[52] JX 21, 2 ("Per Section 1.5 of the APA, the parties will engage in a post-Closing true-up of inventory and other items within 90 days after the Closing Date.").
[53] Tr. 1 (Smith), 178:19–179:1.

### *BDG's Expert's Opinion and Arguments*

BDG's expert issued an initial report and an updated report. BDG's expert also testified during trial. BDG's expert opined MAC's net worth was less than $20 million on December 18, 2008 by pointing out alleged deficiencies in both the EOBS and the Updated Balance Sheet.

BDG contends the EOBS does not establish that MAC's net worth was at least $20 million. BDG's expert gave the following reasons why the EOBS was unreliable: "(1) the EOBS[] failed to show whether the $31,000,000 in equity was produced by capital contributions or by profits; (2) [the EOBS] failed to reveal the source for $14,540,000 in fixed assets; (3) [the EOBS] reflected $7,000,000 for Prepaid Transition Services; (4) the inventory possibly appeared to be overstated; (5) the prepaid rent appeared to be significantly overstated;"[54] (6) the EOBS was not certified by an independent CPA that stated it was in conformity with Generally Accepted Accounting Principles ("GAAP"); and (7) it was an estimated balance sheet.

BDG argues the Updated Balance Sheet does not establish that MAC's net worth was equal to or greater than $20 million because it was not signed and certified by MAC or an independent certified public accounting firm. BDG contends that the Updated Balance Sheet is unreliable because: (1) Brinker did not

---

[54] Pl.'s Opening Br. 51.

introduce documents related to the Updated Balance Sheet's preparation; (2) the Updated Balance Sheet was not referenced in Brinker Restaurant's initial communications with BDG—Brinker Restaurant did not produce the Updated Balance Sheet until July 7, 2022; (3) Brinker Restaurant's corporate designee did not reference the Updated Balance Sheet as a superseding balance sheet to the EOBS; and (4) the Brinker Restaurant's expert's assertion that the Updated Balance Sheet was prepared 60 to 90 days after December 18, 2009 is not reliable because the Updated Balance Sheet allegedly references the Duff & Phelps Solvency Opinion, which is dated March 26, 2009—98 days after December 18, 2009.

BDG also contends that neither the EOBS, nor the Updated Balance Sheet are accurate because the dollar amounts from the Final Closing Statement, EOBS, and Updated Balance sheet do not match.

BDG contends the $7 million for prepaid TSA never left either of MAC's bank accounts. Because there is no debit for $7 million from either account, BDG contends MAC's balance sheet should not reflect $7 million as a prepaid asset. Section 1.6 of the APA provides that the $7 million was allocated to and included within the purchase price ($131.5 million, but later decreased to approximately $88 million).

21

BDG contends the net worth of MAC after the Transaction was approximately $10 million because that is the amount that MAC ultimately paid to Brinker International for the remaining 186 Romano Macaroni Grill sites after accounting for the sale and leaseback of 39 Romano Macaroni Grill sites.[55] The Sale-and-Leaseback Transaction, and the Acquisition, both took place on the same day—December 18, 2008. BDG reasons that the approximately $10 million difference between the Sale-and-Leaseback Transaction and the Acquisition constitutes MAC's net worth.[56] The Court notes that these arguments primarily regard MAC's fair market value, not net worth. Therefore, these arguments are not dispositive.

The transfer of the assets from the Acquisition, including the transfer of assets from the Sale-and-Leaseback Transaction, should be contemplated by both the EOBS and Updated Balance Sheet. BGD contends that the approximately $10 million should represent the entirety of all the following rows on the Updated Balance Sheet: Accounts Receivable-Franchise, Inventory-Food & Beverage, Inventory-DSI, Inventory-Gift Cards, Goodwill, Brinker-Line of Credit, Trade Names, Franchise Agreements, Liquor Licenses, Favorable Leases, and Property

---

[55] JX 66, 8.

[56] Pl.'s Opening Br. 33–34. The Court notes that BDG argues MAC's net worth and fair market value should be ~$10 million because it treats them as one in the same. However, as noted previously, net worth and fair market value are different financial measures.

22

and Equipment.  After taking into account that BDG contends the $7 million in Prepaid Brinker TSA should also be removed from MAC's assets, BDG contends MAC's net worth, at best, was approximately $15 million on December 18, 2008.[57]

BDG also contends that the $31 million in contributions from Golden Gate and Brinker Services went to Mac Parent, not MAC.  At the close of the Transaction, Section 1.3 of the APA dictated that $31 million was to flow from Mac Parent to Holdco, and then from Holdco to MAC.[58]  MAC's bank statements confirm that: (1) $6 million went to MAC's Bank of America account on December 18, 2008;[59] and (2) $25 million went to MAC's Silicon Valley Bank account on December 18, 2008.[60]

### *MAC's Balance Sheets*

The Lease does not require that MAC's balance sheets be prepared in conformity with GAAP.  However, a balance sheet prepared in conformity with GAAP is a substantial indication that a balance sheet was prepared using sound accounting principles.  In this case, there was no definitive proof that either the EOBS or Updated Balance Sheet were prepared using GAAP.  Neither balance

---

[57] Pl.'s Answering Br. 38–39.  The Court notes that BDG does not state on page 38 of its brief that the $9,997,279.50 should include Property and Equipment.  Nonetheless, BDG does state on pages 36–37 that the $9,997,279.50 should include Property and Equipment.

[58] JX 10, Brinker 0106.

[59] JX 31 (showing a $6 million deposit into MAC's Bank of America account on December 18, 2008).

[60] JX 33 (showing four deposits into MAC's Silicon Valley Bank account totaling $25 million on December 18, 2008).

sheet was prepared by a disinterested third party. Rather, both balance sheets were prepared by someone affiliated with Brinker Restaurant.

The Court finds that the EOBS, by itself, is unreliable for the purpose of conclusively establishing MAC's net worth as of December 18, 2008. It was estimated, unaudited, and had not yet gone through the purchase price accounting likely reflected on the Updated Balance Sheet. Although the EOBS was certified by MAC's Vice President of Finance and Development, Brinker Restaurant's expert conceded that the EOBS was not as accurate as the Updated Balance Sheet.[61] Therefore, the Court will not exclusively rely upon the EOBS. Nonetheless, the EOBS provides documentation from Brinker Restaurant that, when combined with other evidence, may sufficiently establish MAC's net worth. The Court will consider the EOBS as a supporting document in conjunction with the Updated Balance Sheet.

BDG contends the Updated Balance Sheet does not accurately reflect the contents of the Sale-and-Leaseback Transaction because certain assets should only total approximately $10 million (the net amount MAC paid to Brinker International). BDG relies on the premise that the amount MAC paid to Brinker International, and the amount reflected in various asset categories on the balance sheet, must be the same. However, this assumes MAC's sale of 39 Romano's

---

[61] Tr. 1 (Smith), 178:19–179:1.

Macaroni Grill sites for approximately $72 million depleted MAC's assets by approximately $72 million. If MAC sold the 39 Romano's Macaroni Grill sites to the third parties for a profit, then it is possible MAC retained assets greater than the approximately $10 million BDG alleges. In other words, MAC's retained assets after the sale-and-leaseback do not necessarily have to equal the approximately $10 million that BDG claims it does. MAC's retained assets reasonably could be more.

The evidence demonstrates that MAC paid consideration of approximately $82 million (after various expenses) to Brinker International in exchange for 225 Romano's Macaroni Grill sites.[62] MAC sold 39 Romano's Macaroni Grill sites to third parties for approximately $72 million.[63] The Sale-and-Leaseback Transaction generated profits for MAC.[64] Thus, it would be necessary for a "spread" to exist between the amount MAC purchased the 39 sites, and the amount MAC sold the 39 sites. Therefore, MAC's retained assets (the 186 Romano's Macaroni Grill sites, etc.) would not equal BDG's alleged $10 million. Rather, if MAC sold the 39 sites for a profit, then MAC's retained assets would necessarily be more than $10 million after the Transaction closed. Thus, the Court is not persuaded by GDG's argument that MAC's Accounts Receivable-Franchise, Inventory-Food & Beverage, Inventory-DSI, Inventory-Gift Cards, Goodwill, Brinker-Line of Credit,

---

[62] JX 21; JX 38, 8.
[63] JX 24.
[64] Tr. 1 (Smith), 187:22–188:2; Def.'s Opening Br. 30.

Trade Names, Franchise Agreements, Liquor Licenses, Favorable Leases, and Property and Equipment categories are limited to $10 million.

BDG also contends the $7 million in Prepaid TSA should not count as an asset because MAC did not have $7 million debited from either of its bank accounts. This is contrary to the APA. Section 1.6 of the APA provides that the $7 million was allocated to and included within the purchase price.[65] Thus, MAC would not have paid exactly $7 million from either of its bank accounts. MAC's payment to Brinker International of $7 million in Prepaid TSA would have been encompassed within MAC's approximately $10 million payment, combined with the third parties' payment of approximately $72 million to Brinker International on MAC's behalf. Thus, the $7 million in Prepaid TSA may properly be listed as an asset on the Updated Balance Sheet.

BDG also contends that the $31 million in contributions from Golden Gate and Brinker Services went to Mac Parent, not MAC. At the close of the Transaction, Section 1.3 of the APA dictated that $31 million was to flow from Mac Parent to Holdco, and then from Holdco to MAC.[66] However, MAC's bank statements confirm that: (1) $6 million went to MAC's Bank of America account

---

[65] JX 10, Brinker 0109.
[66] JX 10, Brinker 0106.

on December 18, 2008;[67] and (2) $25 million went to MAC's Silicon Valley Bank account on December 18, 2008.[68] Because the APA dictated that capital contributions were to flow to MAC, and MAC received the capital contributions, these contributions may be considered MAC's capital contributions.

The Updated Balance Sheet had various indicators that support MAC had a net worth equal to or more than $20 million: (1) it was likely prepared by Brinker International's finance team under the TSA; (2) it was prepared on an accrual basis; (3) Brinker Restaurant produced the Updated Balance Sheet during the normal course of discovery after the EOBS already had been produced;[69] and (4) the Updated Balance Sheet and EOBS both show that MAC had a net worth of $31 million. However, Brinker Restaurant did not call on any employee to testify at trial concerning the preparation of MAC's Updated Balance Sheet. Brinker Restaurant relied upon its expert to testify concerning her opinions as to how the Updated Balance Sheet was likely prepared.

The Court finds the combination of the Updated Balance Sheet and the EOBS is sufficiently reliable for Brinker Restaurant to establish by a

---

[67] JX 31 (showing a $6 million deposit into MAC's Bank of America account on December 18, 2008).

[68] JX 33 (showing four deposits into MAC's Silicon Valley Bank account totaling $25 million on December 18, 2008).

[69] The Court notes that the fact that both balance sheets were produced in the normal course of discovery demonstrates the balance sheets were not created for the purpose of this litigation. Rather, the evidence demonstrates that each balance sheet was prepared within months of the December 18, 2008 Acquisition date, and produced years later as evidence for this trial.

preponderance of the evidence that MAC had a net worth of at least $20 million on December 18, 2008 under the Lease. The Court finds BDG's primary contentions against the Updated Balance Sheet unpersuasive as methods of reducing MAC's net worth by more than $11 million. The Lease did not require GAAP be implemented to prepare a balance sheet. The only requirement is that Brinker Restaurant put forth sufficient evidence to establish by a preponderance of the evidence that MAC had a net worth of more than $20 million. Brinker Restaurant produced two balance sheets showing MAC had a net worth of $31 million. BDG's primary attempts to discredit the EOBS and Updated Balance Sheet do not persuade the Court that MAC's net worth should be reduced by more than $11 million as of December 18, 2008.

Therefore, the Court finds Brinker Restaurant has proven by a preponderance of the evidence that MAC had a net worth of at least $20 million on December 18, 2008. Thus, Brinker Restaurant was released from its obligations under the Lease on December 18, 2008. Brinker Restaurant does not owe unpaid rent to BDG under the Lease.

### *Attorneys' Fees and Expenses*

"Delaware courts follow the American Rule."[70]  Under the American Rule, "'absent express statutory provisions to the contrary, each party involved in litigation will bear only their individual attorneys' fees no matter what the outcome of the litigation.'"[71]

Section 30(i) of the Lease states: "In the event of litigation between the parties to enforce this Lease, the prevailing party in any such action shall be entitled to recover reasonable costs and expenses of suit, including, without limitation, court costs, attorneys' fees, and discovery costs."[72]

The Court finds the Lease unambiguously requires the prevailing party be awarded "reasonable costs and expenses of suit."  Thus, BDG is required to pay Brinker Restaurant's "reasonable costs and expenses" associated with this litigation, in accordance with the Lease.

### <u>CONCLUSION</u>

The Court finds that none of BDG's estoppel arguments prevent BDG from arguing release in this case.  The Court finds Brinker Restaurant bears the burden

---

[70] *MBKS Co. v. Reddy*, 2007 WL 2814588, at *8 (Del. Ch.) (citing *Brice v. State*, 704 A.2d 1176, 1178 (Del.1998)).
[71] *William Penn P'ship v. Saliba*, 13 A.3d 749, 758 (Del. 2011) (quoting *Cantor Fitzgerald, L.P. v. Cantor*, 2001 WL 536911, at *4 (Del.Ch.)).
[72] JX 5, Brinker 0038.

of proving by a preponderance of the evidence that MAC's net worth was equal to or greater than $20 million.

The Court finds that MAC's book value (assets less liabilities) controls the Court's analysis of its net worth, rather than estimates of MAC's fair market value.

The Court relies upon the combination of the EOBS and the Updated Balance Sheet. The Court finds the Updated Balance Sheet, combined with the EOBS, are sufficiently reliable for Brinker Restaurant to establish by a preponderance of the evidence that MAC had a net worth of at least $20 million on December 18, 2008 under the Lease. Therefore, the Court finds Brinker Restaurant was released from its obligations. Brinker Restaurant does not owe unpaid rent to BDG under the Lease.

The Court finds the Lease unambiguously requires the prevailing party be awarded "reasonable costs and expenses of suit." Thus, BDG is required to pay Brinker Restaurant's "reasonable costs and expenses" associated with this litigation, in accordance with the Lease.

**JUDGMENT WILL BE ENTERED IN FAVOR OF DEFENDANT. IT IS SO ORDERED.**

*/s/ Mary M. Johnston*
The Honorable Mary M. Johnston
