**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| B.E. CAPITAL MANAGEMENT FUND LP, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | C.A. No. 12843-VCL |
| | ) | |
| FUND.COM INC., | ) | |
| | ) | |
| Respondent. | ) | |

**MEMORANDUM OPINION ADDRESSING EXCEPTIONS TO SPECIAL MAGISTRATE'S REPORT AND RECOMMENDATION**

Date Submitted: May 23, 2024
Date Decided: July 18, 2024

E. Wade Houston, ABRAMS & BAYLISS LLP, Wilmington, Delaware; *Special Magistrate.*

Richard I.G. Jones, Jr., Harry W. Shenton, IV, Zachary J. Schnapp, BERGER MCDERMOTT LLP, Wilmington, Delaware; *Attorneys for Thomas Braziel.*

**LASTER, V.C.**

This atypical case does not involve a corporate or commercial dispute between adversarial litigants. It involves a receivership proceeding for an otherwise defunct corporation. Those proceeding are usually one-sided, *ex parte* affairs in which the proponent of the receivership seeks relief and, if appointed as receiver, carries out the tasks necessary to fulfill the receivership's mandate. Rarely does anyone provide the court with a different view. When issuing rulings in those unilateral proceedings, the court relies heavily on the good faith of the applicant/receiver and the accuracy and veracity of the information the court receives.

In this case, the process went off the rails.

From the court's limited perspective, the initial case for the receivership seemed (and still seems) sound. And for years, the receivership seemed to be unfolding well. The court had charged the receiver with liquidating an otherwise defunct corporation, and the receiver marshalled the company's assets and addressed its outstanding claims. When those efforts resulted in the company having positive value, the receiver moved to terminate the liquidation process so that the company could continue to operate as a publicly traded investment vehicle. The court approved the receiver's request, conditioned on the receiver bringing the corporation into good standing with the Delaware Secretary of State, becoming current in its securities filings, and holding a meeting of stockholders to elect a new board of directors.[1]

---

[1] The court doubts it would make the same ruling today. The receivership in this case proceeded under Section 226(a)(3) of the Delaware General Corporation Law (the "DGCL"), which contemplates the appointment of a receiver when the corporation "has abandoned its business and has failed within a reasonable time to

Years later, the court received a letter from a concerned stockholder. The letter asserted that the receiver never held the meeting of stockholders that the court ordered. The letter also asserted that that the receiver had embezzled receivership funds. The allegations were sufficiently concerning that the court appointed a special magistrate to investigate what happened and make recommendations on how the court should proceed.[2] The order appointing the special magistrate stressed that "[i]f there is no substance to the allegations, or if additional proceedings are not warranted, then the Special [Magistrate] will say so."[3]

There was substance to the allegations. After completing his investigation, the special magistrate prepared a draft report.

The draft report carefully documented what had taken place during the receivership. Based on those recommended findings, the special magistrate

---

take steps to dissolve, liquidate or distribute its assets." 8 *Del. C.* § 226(a)(3). That section does not authorize a receivership that revives the defunct corporation. *In re Forum Mobile, Inc.,* 270 A.3d 878, 889 (Del. Ch. 2022) ("For a custodian appointed under Section 226(a)(3), therefore, the scope of potential authority is limited to liquidating the affairs of the abandoned corporation and distributing its assets."). To draw on analogies from bankruptcy, a Section 226(a)(3) receivership is like a Chapter 7 liquidation, not a Chapter 11 reorganization.

[2] On July 18, 2023, the Court of Chancery amended its rules to change all references to "Master in Chancery" to "Magistrate in Chancery," thereby avoiding potential misunderstandings about a term that many associate with slavery. The Chancery term derives from English court practice and is not associated with slavery. Nevertheless, unless a litigant knew that history, the term could be offensive. The appointment predated that revision. Nevertheless, this decision uses the term "special magistrate."

[3] Dkt. 79 ¶ 4.

recommended the court find the receiver had used funds from the receivership for personal gain. As a remedy, the special magistrate recommended that the court require the receiver to repay the amounts he took from the corporation. The special magistrate further recommended that the receiver immediately repay $2,000,726.93 in restitution, believing that the receiver's liability for those amounts was clear as a matter of law.

The special magistrate explained that the corporation could have additional claims for restitution, as well as affirmative claims against the receiver that went beyond restitution, such as an action for disgorgement of the profits the receiver generated using the corporation's funds. To avoid any appearance of conflict, the special magistrate declined to pursue those additional claims and recommended that the court appoint a successor receiver who could decide how to proceed. The draft report also recommended that the receiver show cause why he should not have to pay the special magistrate's expenses.

Under this court's procedures, a party can take exceptions to a draft report. The receiver did so, presenting a host of exceptions. The special magistrate addressed them in a final report and a supplemental submission.

A special magistrate's final report does not constitute a judicial decision. If a party takes exceptions to the final report, as the receiver did, then a constitutionally appointed judicial officer must review the report *de novo.*

To the receiver's credit, he largely acknowledged the accuracy of the special magistrate's recommended factual findings. He also accepted aspects of the special

3

magistrate's recommended remedy by agreeing to provide restitution and to pay the costs of the special magistrate's investigation.

The receiver continues to press four exceptions. First, he disputes the recommended finding that he acted wrongfully when causing the company to claim a net operating loss in the amount of $8.725 million on its tax returns. Second, he asserts that certain statements in the final report improperly draw inferences based on his invocation of the Fifth Amendment privilege against self-incrimination. Third, he contends that when evaluating potential bad-faith fee-shifting under the American Rule, the report's analysis violated his Sixth Amendment right to a jury trial by noting that his conduct satisfied the elements for potential crimes. Finally, he claims that the recommended amount of restitution that he should pay immediately is too high. Rather than a payment of $2,000,726.93, he proposes a payment of $1,850,726.93.

This decision reviews the final report *de novo*. The court overrules the first exception. After a *de novo* review of the record, the court agrees that the receiver lacked a reasonable basis to claim a net operating loss in the amount of $8.725 million.

The court overrules the second exception. The special magistrate cited the receiver's invocation of his Fifth Amendment privilege against self-incrimination to explain the presence of gaps in the record. In a civil trial, a court may also consider whether a particular invocation of the Fifth Amendment is warranted by the possibility that a question could lead to self-incrimination. The special magistrate

4

provided an example of a question where, in his view, the question could not lead to self-incrimination and yet the receiver still invoked the privilege. After a *de novo* review of the record, the court finds that the special magistrate did not improperly draw inferences based on the receiver's invocation of the privilege. Regardless, the court has not drawn any inference. Nor has the court purported to convict the receiver of any crimes.

The court overrules the third exception. Evaluating bad faith fee-shifting requires determining whether a party has acted in a grossly egregious manner. When the record evidence suggests that a party's actions could satisfy all the elements of a crime, that tends to support a conclusion that bad faith fee shifting in warranted. The special magistrate analyzed the receiver's conduct from that standpoint. The special magistrate did not and could not recommend convicting the receiver of a crime. Nor is this court convicting anyone of a crime by adopting the receiver's recommendation.

The court sustains the receiver's last exception in part. Whether the special magistrate correctly calculated the amount of immediately payable restitution depends on whether the receiver's father-in-law and brother-in-law acted wrongfully when they provided funds that the receiver co-mingled and co-invested with company funds. The special magistrate recommended a finding that treated the receiver's in-laws as wrongdoers, but the court does not believe that the evidence is sufficiently clear to make that determination at this stage. The receiver has proposed a reduced amount for immediate repayment in the amount of $1,850,726.93, which is $150,000 less than the special magistrate's award. But the receiver's proposal overcorrects by

5

$94,337.06. Correcting the receiver's overstatement results in the amount being $1,945,063.99. The court adopts that amount. If the successor receiver seeks to pursue additional restitution, then the court can revisit the dispute over the in-laws' involvement.

The court otherwise adopts the special magistrate's report and recommendation in full. This decision removes the receiver, and a new receiver will be appointed. The court thanks the special magistrate for his outstanding work.

## I.    FACTUAL BACKGROUND

The court draws the facts from the underlying record, which the court has reviewed *de novo*. That record consists of over 23,000 documents that the special magistrate obtained during his investigation, plus deposition testimony from the receiver and two other witnesses.[4] When the final report contains a recommended finding of fact, and when the receiver has not challenged the recommended finding, then the court has adopted the finding when supported by the record. When the receiver has contested a recommended finding of fact, the court has made its own determinations.

---

[4] Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "Ex. — at —" refer to the exhibits to the Report with the page number designated by the last three digits of the production stamp or by an internal page number. If an exhibit used paragraph numbers, then references are by paragraph. If an exhibit is a video or audio recording or a transcript of one, then references are by time.

## A. The Company's Beginnings

The corporation at the center of this case (the "Company") started life as one of many entities that Imran Husain formed and took public to sell to market manipulators. In his own words, Husain "drafted phony business plans for the companies, purporting that the companies had actual plans to engage in business." Ex. 263 at 5. After taking the shell companies public, Husain retained a majority stake that he could sell to someone who wanted the publicly traded vehicle.

In 2004, Husain's spouse formed the Company under the name Eastern Services Holdings, Inc. Later that year, the Company merged with a Nevada corporation that purported to offer verbal tax consultation and analysis to casinos. In 2006, the Company completed an IPO.

After the IPO, Husain indirectly held 71.8% of the outstanding common stock. Despite its purported casino-advisory business, the Company was merely a shell with a public listing. Its balance sheet for the period ended September 30, 2007, recorded total assets of $10,429 (literally; not expressed in thousands) and liabilities of $115,087. The Company had zero revenue.

In December 2007, Jason Galanis acquired Husain's controlling interest. Earlier that year, Galanis had entered into a consent judgment with the SEC that barred him from acting as an officer or director of any public company for five years.

Acting through intermediaries, Galanis merged two dubious entities with and into the Company. Through the merger, the Company acquired the website address www.fund.com (the "Website Address"). To help the Company capitalize on the value of that asset, the Company changed its name to Fund.com Inc.

7

According to Galanis, one of the constituent entities that merged with the Company had purchased the Website Address for nearly $10 million. The Website Address certainly had some value, but Galanis appears to have manufactured the $10 million figure through fraudulent transactions. By all indications, that valuation was an order of magnitude beyond what an arm's length buyer might pay.

Galanis used the Website Address and its fabricated asset value to portray the Company as a worthy investment. The Company now described itself as "a development stage company that intends to operate an internet-based investment fund marketplace and online community." Ex. 23 at 3.

In summer 2008, the Company announced that it had raised $450,000 from a private placement with Westmoore Capital Group, Series II. One of Galanis's associates ran that entity. Using the purported capital infusion, the Company announced a series of investments. One of them was a legitimate purchase of 60% of the equity in a startup provider of actively managed exchange-traded funds (the "ETF Provider"). Ex. 29; Ex. 27 §§ 1.1(b), 1.2(b).

In September 2009, the Company disclosed that it had amended its certificate of incorporation to increase its authorized capital stock from 120 million to 320 million shares. The Company also announced that it had obtained a revolving line of credit from Galanis's affiliates. The Company pledged substantially all its assets, including the Website Address, to secure the revolver.

The Company's various announcements attracted market interest and drove up the value of the stock. Behind the scenes, Galanis paid kickbacks to financial

advisors to get them to invest their client portfolios in the Company. At its height, the Company's stock price reached $570 per share. Meanwhile, Galanis and his associates sold approximately 110,000 shares at an average price of $230 per share for aggregate proceeds exceeding $25 million.

During the first half of 2010, the Company missed two deadlines for filing its quarterly reports on Form 10-Q. The stock price collapsed. In August, the Over-The-Counter-Bulletin Board delisted the Company. That fall, the Company completed a 120:1 reverse stock split. Even after the split, the Company's stock traded for as little as six cents per share.

Also during 2010, a dispute arose between the Company and the ETF Provider. After the Company's problems, the ETF Provider had no interest in the Company remaining an investor and sought to cancel the Company's equity stake. The Company resisted and, in 2012, the dispute turned into a lawsuit.

**B.     The Investment Fund Invests In The Company.**

Petitioner B.E. Capital Management Fund LP (the "Investment Fund") is a Delaware limited partnership. Thomas Braziel co-founded the Investment Fund with a partner who provided investment capital. Braziel's co-founder was not involved with the Company.

Through its general partner, B.E. Capital Partners LLC (the "General Partner"), Braziel controlled the Investment Fund. He described it as "an event-driven investment partnership, with a focus on sourcing, analyzing, and purchasing unlisted distressed credit and special situations equity." Ex. 192.

9

Braziel thought the Company's stock was trading at a fraction of the value of its two real assets: the Website Address and the disputed equity interest in the ETF Provider. In February 2013, he caused the Investment Fund to begin buying shares of the Company's common stock. As he later explained in a YouTube video, the Investment Fund "sat on the bid for like two years and basically ended up owning like 20% of the Company at a $100,000 valuation, so literally it was a $20,000 investment."[5]

## C. The Sale Of The Website Address And A Settlement With The ETF Provider

In 2014, Galanis and two of his associates—Devon Archer and Hugh Dunkerley—sought to transfer the Website Address to a new entity for use in a crowd-funding scheme. They created a new entity named Fund Alliance Corporation that purported to buy the Website Address for $1.5 million.

In 2015, the Company settled its litigation with the ETF Provider. Subject to exceptions not relevant here, the settlement called for the Company to receive $700,000 up front, another $3.8 million in three installment payments, and 6% simple interest on the unpaid balance running from the date of the first installment. Once the ETF Provider completed the payments, the Company's interest in the ETF Provider would be canceled.

---

[5] The Acquirers Podcast, *Priority Position: Thomas Braziel on distressed activism with Tobias on The Acquirers Podcast*, YouTube (Sept. 13, 2019), http://www.youtube.com/watch?v=FDMhvyFwzcA&t=22m33s [hereinafter, Braziel YouTube Interview]. *See generally id.* at 18:55–28:06 (Braziel YouTube Interview's full segment on Company's history and receivership).

The upfront payment went to the Company's litigation funder. The first installment payment of $1.3 million went to the Company's counsel and Galanis's affiliates. That left $2.5 million that the Company could expect to receive.

## D. Braziel Secures Appointment As Receiver.

In October 2016, the Investment Fund filed this action. The petition sought to have Braziel appointed as a liquidating receiver for the Company under Section 226(a)(3) of the DGCL. That statute authorizes a court to appoint a receiver when "the corporation has abandoned its business and has failed within a reasonable time to take steps to dissolve, liquidate or distribute its assets." 8 *Del. C.* § 226(a)(3).

When the Company did not respond to the petition, the Investment Fund moved for a default judgment. The motion emphasized that Braziel was a qualified person who had studied the rules governing receivers of Delaware corporations.

By order dated November 29, 2016, the court entered a default judgment and appointed Braziel as a receiver. The order charged Braziel with liquidating the Company and distributing its net assets to its investors. The order did not authorize Braziel to conduct business through the Company.

## E. Braziel's Initial Efforts As Receiver

When Braziel took over as receiver, the Company had not filed annual reports with or paid franchise taxes to the State of Delaware since 2011. On paper, the Company owed over $8 million to Galanis's affiliates. The Company had few formal records, and Braziel had to reconstruct its history by pooling information from former service providers and former directors.

11

During these early stages, Braziel's personal interests aligned with the tasks he was expected to perform as receiver. Braziel could generate a sizeable return for the Investment Fund by creating value through the liquidation process. Braziel acted vigorously to do just that.

On December 15, 2016, Braziel opened a bank account for the receivership with WSFS Bank in Wilmington, Delaware (the "WSFS Account"). On December 22, he moved for an order requiring that the Company's creditors make any claims against the receivership estate by April 14, 2017. The court approved the order and set a bar date for asserting claims. Galanis and his associates failed to assert timely claims, which prevented them asserting any claims based on their purported $8 million in debt. Braziel disallowed claims for two other potential creditors for another $1.5 million.

Braziel also improved the terms of the settlement with the ETF Provider. The settlement called for the ETF Provider to make another payment of $1.5 million by January 31, 2017. When the ETF Provider could not pay on time, Braziel negotiated for an extra $100,000, plus accelerated interest payments.

Braziel also filed a lawsuit in New York to recover the Website Address from Fund Alliance. Braziel alleged that the Company was insolvent when Fund Alliance bought the Website Address and that the court should rescind the transaction as a fraudulent conveyance.

## F.     Braziel Begins Misusing Company Funds

Once the Company had money, Braziel's interests and the Company's interests began to diverge. Braziel soon began using the Company's funds to benefit himself.

12

In November 2017, the Company received the settlement payment of $1.5 million. Over the next eight months, Braziel caused the Company to wire a total of $121,000 to his personal checking account in eighteen installments. Braziel never disclosed the transfers to the court or his attorneys.

Approximately six months later, on June 21, 2018, Braziel settled the New York action against Fund Alliance. Under the settlement agreement, the Company agreed to re-acquire the Website Address for $750,000.

Braziel routed the founds through the General Partner and took $50,000 for himself along the way. To fund the transaction, the Company transferred $800,000 to the General Partner. The General Partner then paid $750,000 to Fund Alliance. The General Partner simply kept the additional $50,000.

The General Partner's records show that the additional $50,000 went to Braziel. The General Partner made an initial distribution to Braziel in the amount of $28,800, followed by fourteen smaller payments in amounts ranging from $300 to $7,000 and totaling $21,200.

## G.    The Belmond Investment

Braziel next decided to use the Company's money to fund high-risk, high-reward investments. Using a combination of money he extracted from the Company, plus some funds received from family members, Braziel invested in common stock and call options on the stock of Belmond, Ltd., a Bermudian hotelier. Between July 12 and 18, 2018, the Company wired $315,000 to Braziel's checking account. On July 17, Braziel opened a brokerage account with Interactive Brokers, LLC (the "First

Brokerage Account"). On July 18 and 19, Braziel moved $270,000 from his checking account to the First Brokerage Account.

Starting on July 18, 2018, Braziel used the funds in the First Brokerage Account to buy and sell common stock and call options for Belmond's stock. Between October 2 and 3, 2018, Braziel moved the Belmond options and common stock to a new brokerage account with Fidelity Investments (the "Second Brokerage Account"). By that point, the value of the options had grown to $493,775, representing a gain of 83% on the Company's contribution of $270,000.

## H. Braziel Moves To Discontinue The Liquidation

Having seen that he could use the Company's assets to make investments, Braziel filed a motion on October 16, 2018, that asked the court to discontinue the liquidation and approve the Company's re-emergence as a publicly traded investment vehicle. In his motion, Braziel argued that "cause for liquidation no longer exists" because he had "recovered, for stakeholders' benefit, the Company's principal assets, namely all . . . settlement proceeds outstanding as of his appointment . . . and the fund.com [Website Address] . . . ." Dkt. 73 ¶ 8.

Braziel's application failed to mention that he had misappropriated $441,000 from the Company and held the Website Address through the General Partner, an entity he owned personally. Braziel's application also failed to mention that he had

14

already started pitching the Company as a vehicle to buy remnant assets and bankruptcy claims.[6]

Braziel proposed bringing the receivership to a close by (i) calling a meeting of stockholders within 180 days to elect new directors, (ii) bringing the Company into good standing with the Delaware Division of Corporations, and (iii) bringing the Company current on its SEC reporting. By order dated October 17, 2018, the court granted Braziel's application (the "Discontinuation Order").[7]

## I.    Braziel Sells The Belmond Investment And The Website Address.

Two months after the entry of the Discontinuation Order, Braziel's investment in Belmond paid off. The bulk of the position consisted of out-of-the-money call options expiring on December 21. Just in time, on December 14, LVMH Moët Hennessy—Louis Vuitton SE announced an acquisition of Belmond's public equity at

_____

[6] *See* Ex. 183 (Oct. 9, 2018) ("Fund.com/BE Capital would market and source remnant assets via ABI conferences / and as part of our general US based BK claim sources process."); *id.* (proposing that Company contribute $400,000 to majority-owned alternative entity that would operate "de novo remnant asset business"); Ex. 186 (Oct. 12, 2018) ("Do you want to help build Fund.com Inc.? We have about 2/2.5m in NAV and will be kicking the entity out of receivership soon/setting up a Board//and raising maybe 2-10 m to turn it into a publicly traded holding company."); Ex. 187 (Oct. 18, 2018) ("We had a great meeting with [potential counterparty] yesterday. He really wants to work on Fund.com with us and thinks he can raise 10-20m for the shell and in turn start issuing as Super voting A shares for 20% of the entity, so we can control and can use for illiquid assets. Thoughts? Can we still launch the liquid strategy with you and put the GP in Fund.com for income?").

[7] The court made one modification. Because the Company was technically void until it restored its good standing with the Secretary of State, the court required that Braziel take that step first. Dkt. 74. The court would want meaningful briefing before granting the same relief today. *See* n. 1, *supra*.

$25 per share. Braziel sold the call options for $936,344.77, generating a gain of $832,464.61. In total, the value of the Belmond Investment amounted to approximately $1,494,337.06.

Braziel also sold the Website Address. In December 2018, a third party agreed to buy the Website Address for $1.5 million. After a 15% sales commission, the Company netted $1.275 million, resulting in a gain of $525,000 over the $750,000 the Company paid to re-acquire the Website Address in 2017.

Braziel helped himself to the proceeds. Between December 20, 2018, and February 13, 2019, the Company wired $1.65 million to Braziel's checking account. Braziel spent $347,786.43 on a sapphire ring and a pair of emerald-and-diamond earrings from Lorraine Schwartz, $61,355.31 on a German watch, and over $400,000 on luxury hotel stays, apparel, art, and other fineries.

Braziel invested the rest of his takings in bankruptcy claims, cryptocurrency, leveraged loans, and high-risk equities. Many of these investments produced outside gains. Despite having obtained the gains using Company funds, Braziel did not share the gains with the Company. One of the potentially valuable claims that the Company possesses against Braziel is an action to force him to disgorge the profits he generated from using the Company's funds to make successful investments.

## J. Tax Issues

The Discontinuation Order required that Braziel bring the Company current in its SEC filings. To achieve that goal, Braziel had to bring the Company current in its tax filings.

16

In August 2019, Braziel caused the Company to retain Fisher Weis, LLC to prepare its historical and receivership-era tax returns. Braziel had not previously hired a tax preparer.

Problems quickly emerged. Fisher Weis asked for the Company's bank statements from December 2016 through the present to "reconcile the cash balance." Ex. 255 at '114. Braziel provided Fisher Weiss with falsified records in the form of a spreadsheet titled "Bank Account - Trial Balance_2016 to Current" (the "Modified Trial Balance").

When Fisher Weis pressed Braziel for account statements, Braziel claimed that the bank had not authorized him to hand them over. That excuse would not hold up, so Braziel manufactured alternative versions of the account statements that tracked the Modified Trial Balance.

While working with Fisher Weis, Braziel learned that the Company might owe significant amounts to the Internal Revenue Service and the Delaware Division of Revenue. Braziel adopted a tax avoidance strategy that principally relied on the Company claiming an $8.725 million net operating loss (the "NOL") from its sale of the Website Address. To substantiate the NOL, Braziel started with the $10 million purchase price for the Website Address that Galanis had fabricated. Then he added the commission for selling the Website Address to a third party. Then he subtracted the ultimate sale price of $1.5 million ($10,000,000 + $225,000 - $1,500,000 = $8,725,000). Braziel also told Fisher Weis that the Company had sold the Website Address in 2017, one year before it actually did.

The Company used the NOL to offset gains in 2017 of $2.1 million. For that year, the Company paid only $1,544 in federal income taxes. A tax preparer later determined that the NOL deprived the IRS of over $485,000.

Braziel knew from his investigation into the Company that the $10 million purchase price for the Website Address was not a legitimate number. It was a figure that Galanis had fabricated to support a pump-and-dump scheme, and it was an order of magnitude higher than what the Website Address had actually sold for in three subsequent transactions. Braziel nevertheless used the $10 million figure.

Fisher Weis continued working on the Company's taxes until 2020, when Braziel decided to find a lower cost provider. In April 2020, the Company began using Frankel Loughran Starr & Vallone LLP (the "Frankel Firm"). Around the same time, the Company re-achieved its good standing with the Delaware Secretary of State.

Although the Frankel Firm charged less, its partners asked tough questions. One partner discovered that the Company had misstated the date of the Website Address sale in its 2017 return, and he concluded that the Company's 2017 and 2018 federal tax returns were "not correct." Ex. 316. The Frankel Firm also advised that the NOL was "likely not good." *Id.*

The Frankel Firm recommended amending the Company's 2017 and 2018 returns, but Braziel declined. The Frankel Firm ultimately filed the Company's 2019 tax returns, but refused to work with Braziel again.

## K.      The Goldberg Letter

Lyn Goldberg is a longtime stockholder of the Company who spent part of his career as a federal prosecutor. Goldberg bought shares of Company stock believing

18

that it was a way to invest in the ETF Provider. After meeting Braziel in 2014, they communicated regularly about Company-related matters.

Goldberg's trust in Braziel began to wane after the entry of the Discontinuation Order. As more and more time passed without Braziel convening a meeting of stockholders, Goldberg began to wonder what Braziel was doing. By fall 2020, Goldberg had become sufficiently frustrated that he sent Braziel a lengthy email quoting an *American Jurisprudence* passage on fraud, questioning the lack of information Braziel provided to the stockholders, and stressing Braziel's failure to hold a stockholder's meeting. Braziel replied, "Hey Lin [sic] - if you are unhappy you can always sell your shares in the open market. All of your accusations are baseless." Ex. 330 at '687.

When Braziel did not make any changes in response to Goldberg's email, Goldberg warned Braziel that he intended to write the court. *See* Ex. 341. Braziel still did nothing.

As promised, Goldberg sent the court a letter dated December 20, 2021. The letter accused Braziel of "embezzl[ing] three million dollars from the shareholders," investing those funds for his personal benefit, failing to hold a meeting of stockholders, and withholding from the court his plan to use the Company as a vehicle for risky investing. Dkt. 78, Attach. at 1, 6, 9–10.

## L.     The Special Magistrate's Investigation

By order dated January 11, 2022, the court appointed the Special Magistrate to investigate Goldberg's allegations and issue a report and recommendation. The court gave the Special Magistrate the following charge:

19

The Special [Magistrate] is charged with investigating the allegations in the *ex parte* submission. As part of that effort, the Special [Magistrate] shall determine if the meeting of stockholders contemplated by the [Discontinuation Order] took place. The Special [Magistrate] also shall determine whether the motion to discontinue liquidation was improvidently granted based on a failure by Braziel to disclose material information regarding his plans for the Company, taking into account that the liquidation proceeding was a one-sided, *ex parte* affair under which petitioner's counsel had a heightened ethical duty of disclosure when making submissions to the court. The Special [Magistrate] shall determine whether Braziel has engaged in self-dealing transactions involving the Company. The Special [Magistrate] shall evaluate whether Braziel used the court's processes such that the receivership proceeding resulted in an unfair outcome for the Company and its stockholders.

After conducting his investigation, the Special [Magistrate] shall submit a report to the court. The report shall contain a recommendation as to whether further action should be taken. The Special [Magistrate] will use his independent judgment. The Special [Magistrate] is not required to recommend additional proceedings. If there is no substance to the allegations, or if additional proceedings are not warranted, then the Special [Magistrate] will say so.

Dkt. 79 ¶¶ 3–4 (citation and paragraph numbering omitted).

That same day, Braziel began contacting stockholders individually and asking to buy their shares. The Special Magistrate believes he hoped to acquire a majority of the shares so that he could approve a dissolution of the Company by written consent and render the receivership moot. In those conversations, Braziel did not disclose that the court had appointed a Special Magistrate, and he offered different valuations to different stockholders.

Braziel also tried to conceal his self-dealing. Braziel already had created falsified versions of the Company's bank records to support positions taken in the Company's tax returns for 2017 and 2018. Now, he sought to modify the bank account statements for 2020 and 2021.

20

To restore the funds that he had taken, Braziel caused two investment vehicles to sell investments and make payments to the Company. He also communicated with the Company's transfer agent, bank personnel, and his counsel in an effort to mask his self-dealing and demonstrate that his actions had been above board.

On January 13, 2022, Braziel emailed the Special Magistrate to deny Goldberg's allegations and promise a prompt liquidation. Braziel wrote as follows:

> I must apologize for the slowness in getting the annual meeting done. It really has taken longer than it should, and while I'd like to say it's due to complex pre-receiverships issues (certainly hasn't helped), or Covid slowing down the process . . . , ultimately its own [sic] me keep the ball rolling on this. Please note I've been prowling through the items needed to get an annual meeting completed ASAP (requesting the NOBO list and getting counsel to generate the required proxy materials etc.). Needless to say *Mr. Goldberg's letter is completely false - no cash has been invested in any deals - and at this point the goal is to simply hold an annual meeting and then liquidate the Company distributing the cash to shareholders*, which is what Mr. Goldberg wants to see happen anyway.

Ex. 360 (emphasis added).

On January 14, 2022, Braziel sent the modified bank statements and the Modified Trial Balance to the Special Magistrate. The modified statement for December 2021 reflected a balance of $2,155,280.47, but the actual balance for that period was $24,956.47. Braziel posted the modified bank statements to a website that he maintained for the Company's receivership to show that everything was fine.

Between January 20 and 26, 2022, Braziel transferred $2,130,388.00 into the Company's bank account, increasing its balance to $2,155,280.47. He told a colleague that Goldberg's allegations were false and that "the judge is silly for" ordering an investigation. Ex. 434 at '316.

21

On January 27, 2022, at 1:41 p.m., the Special Magistrate issued a subpoena to the Company's bank based on irregularities in the modified bank statements. Braziel responded by pulling them from the website and deleting the relevant webpage.

Braziel also lawyered up. Guided by his new counsel, Braziel began cooperating with the Special Magistrate.

## M.  The Report

On January 2, 2023, the Special Magistrate provided Braziel with a copy of his draft report. On January 3, the court approved a stipulated order establishing a schedule for Braziel to take exceptions to the draft report. Braziel initially raised twenty-seven exceptions.

On June 30, 2023, the Special Magistrate filed the final version of his report. He offered the following proposed findings and recommendations:

> 1. Braziel violated the Discontinuation Order by failing to call any meeting of the Company's stockholders.
>
> 2. The court improvidently granted Braziel's motion to discontinue the Company's liquidation after Braziel withheld information material to the court's decision.
>
> 3. Braziel committed self-dealing by misappropriating the Company's cash in order to enrich himself and support his investment firms, High Five Capital and 507 Capital.
>
> 4. Braziel used the court's processes to create an unfair outcome for the Company and its stockholders. If Braziel had not misled the court regarding how he conducted the receivership, then the court would have revoked his authority as receiver before most of his self-dealing could have happened.
>
> 5. The court should appoint a new receiver for the Company. The Company's most valuable assets are its causes of action against Braziel

22

and [his affiliates] for breach of fiduciary duty, unjust enrichment, and civil conspiracy. The record reflects the absence of any genuine dispute of material fact concerning Braziel's restitution liability for at least $2,000,726.93. Braziel should show cause why the court should not enter partial judgment directing him to pay the Company that amount now. This relief would be without prejudice to the new receiver's right to seek additional recoveries. Braziel also should show cause why he should not pay the expense of the special [magistrate's] investigation, which the Company has advanced under a court order.

Report at 60–61 (citation omitted).

The parties agreed that the Special Magistrate could file a further submission addressing the merits of any exceptions he rejected. After receiving that submission, Braziel filed his notice of exceptions to this court. In his brief, Braziel stated:

By and large, Braziel accepts the Report's extensive factual and legal findings. He further acknowledges and agrees to reimburse the Company for the expense of the Special [Magistrate's] investigation. He also accepts and agrees to make restitution payments to the Company, with the only modification being an accurate determination of certain proceeds attributable to the third-party investor. Braziel is further willing to enter into an agreement or stipulation with a new receiver and to make restitution payments based on a mutually agreed-upon payment plan.

Braziel Br. at 3. Braziel continued to pursue only the exceptions that this opinion addresses.

## II.    LEGAL ANALYSIS

When ruling on exceptions to a magistrate's recommendations, a constitutional judge must conduct a *de novo* review, both as to matters of fact and issues of law. *See DiGiacobbe v. Sestak,* 743 A.2d 180, 184 (Del. 1999). In this case, the state of the record makes it possible to conduct a *de novo* review without a separate evidentiary hearing.

23

## A.    The NOL Exception

Braziel first takes exception to the Special Magistrate's recommended finding that the value of the NOL was unsupported and unreasonable. The Report states:

> Braziel's principal tax strategy involved the Company claiming an $8.725 net operating loss (the "NOL"). The NOL took the $10 million purchase price that Galanis fabricated in 2007, added Media Options' broker fee from 2018, and backed out the $1.5 million sale price from the 2018 [Website Address] Sale ($10,000,000 + $225,000 - $1,500,000 = $8,725,000). The Company reported on its 2017 tax return that it had sold the [Website Address] in 2017 (one year before it did). The Company applied the NOL to avoid paying taxes on its 2017 gains from the [ETF Provider] Settlement and the [ETF Provider] Judgment. In the end, Braziel paid $1,544 in federal income tax on the receivership's over-$2.1 million net recovery. According to a spreadsheet prepared by a tax professional, the  unsupported NOL cost the IRS over $485,000.

Report at 49 (citations omitted). The Special Magistrate further stated that the Company had to rely on the NOL because it lacked the funds to pay its actual tax liability due to Braziel's takings. Response ¶ 6.n; *see also* Report at 47–48.

Braziel advances a range of challenges to this recommended finding. None are persuasive.

### 1.    The Factual Objection

Braziel first argues that the factual record does not support the Special Magistrate's recommended finding. To the contrary, the record contains ample evidence to supports the Special Magistrate's recommended finding after *de novo* review.

The record shows that Galanis and his network of frontmen fabricated the purported $10 million purchase for the Website Address. Importantly, Braziel does not claim otherwise. Instead, he argues that "there is . . . little evidence that no

24

consideration was exchanged for the [Website Address]" and points to the shares issued by the Company in exchange for the cash used to purchase the asset. Braziel Br. at 26.

The issue for purposes of the NOL is not whether the Company paid consideration, but whether the transaction actually supported a value of nearly $10 million. There is no evidence suggesting that $10 million was a bona fide, third-party value. The purported $10 million purchase price resulted from what was effectively a round-tripping of consideration through Galanis's affiliates and associates. *See* Ex. 419. They wanted a number they could use to inflate the value of the Company for purposes of a pump-and-dump scheme. The record as a whole indicates that they inflated the value of the asset by approximately an order of magnitude.

The record also shows that Braziel knew Galanis had fabricated the purported $10 million purchase price. After taking over as receiver in 2016, Braziel uncovered Galanis's fraudulent scheme. On December 3, 2016, he described the fraud as follows:

1.) Set up shell entities (like 10 or 20 – some in NV, some in DE, and some offshore)
2.) Complete fake capital raises to yourself of $30M USD to buy assets;
3.) Then buy fake or highly inflated valued assets from yourself:
a. In Fund.com Capital's case they 'bought':
    i. Fund.com domain from FST Limited for $10M (there is no information on FST Limited other than a single mention in the reverse merger SEC documents – the domain was probably worth $1M or so at the time)
    ii. Invest the other non-existent monies into an offshore CD from Global Bank & Commerce for $20M
4.) Then take the $30M bogus balance Company (Fund.com Capital Inc.) public through a reverse merger and use the bogus asset value of the Company as a way to raise additional equity capital, as well as to use the stock to equity deals with potential sellers

Ex. 425 (third emphasis added). Other communications confirm that Braziel knew Galanis had fabricated the $10 million purchase price and that the Website Address's real value was closer to $1 million.[8]

And the record demonstrates that the Company both re-acquired and sold the Website Address in 2018, not in 2017, as Braziel claimed for purposes of the NOL. The Company repurchased the asset when settling the New York litigation in June 2018. Braziel hired an agent to sell the Website Address in October 2018. A sale closed in December 2018, and the Company received the proceeds in January 2019.

Braziel thus knew that the actual value of the Website Address in 2018 was around $1 million. He could not have believed in good faith that the Website Address was worth $10 million in 2017, which was necessary to support the NOL.

Having conducted a *de novo* review of the record, the court agrees with the Report's findings that Braziel knowingly reported a false cost basis for the Website Address to generate a fictional NOL.

---

[8] *See* Ex. 80 at '941–42 (Braziel writing in separate December 3, 2016 email that "In Fund.com Inc.'s case I already understand that [Galanis] inflated the value of the Fund.com domain (reportedly worth 10M – actually worth maybe 1M) . . . to bogusly inflate the asset value of Fund.com."); Ex. 77 (December 10, 2016 email from Braziel stating "If [Galanis] owned [the Website Address] in 2004, then he owned it in 2008 when Fund.com *purported* [sic] purchased it for 10M . . . ."); Ex. 78 (same); Ex. 437 (June 24, 2022 voice message from Braziel to Company stockholder stating "[t]here is, you know, audit risk around that NOL. I mean the basis for our $10 million loss, which is from the domain, is just based on a market transaction that is potentially, you know, fake. And so, I mean, I don't want to tell the IRS that."); Stout Dep. 81 ("[t]he reported purchase price was $10 million. But what [Braziel] conveyed to me and what I understood to be the general understanding was that that was a made-up purchase price that [Galanis] facilitated amongst himself basically to inflate the balance sheet of [the Company].").

## 2.     The Jurisdictional Objection

Braziel next argues that neither the Special Magistrate nor the court has jurisdiction over the Company's tax filings. Braziel asserts that only the "Secretary of the United States Treasury, by delegation to the IRS" has the authority to assess a taxpayer's tax liability and "[t]he Report seeks to have the Court infringe upon this authority by assessing the Company's 2017 tax liability and determining the existence of a deficiency." Braziel Br. at 16. Those arguments miss the point. This case will not determine the Company's tax liability or find that there was a deficiency. This case is about determining what went on during the receivership.

The Special Magistrate evaluated the legitimacy of the NOL because the court charged him with investigating what happened during the receivership. The court instructed the Special Magistrate to investigate the allegations of self-dealing that Goldberg raised. The fabrication of the NOL was part of Braziel's self-dealing and his subsequent efforts to cover it up. His involvement in the fabrication of the NOL also relates to his credibility and to fee-shifting under the bad faith exception.

When determining that Braziel used a knowingly false cost basis to avoid taxes that the Company could not pay because of Braziel's self-dealing, the Special Magistrate did not re-assess the Company's tax liability. Instead, the Special Magistrate carried out his charge. By adopting the Special Magistrate's well-supported findings after *de novo* review, the court is not determining the Company's tax liability. Other tribunals may address that issue.

A particular factual or legal issue can be pertinent in multiple settings. Resolving a properly raised legal issue in one setting does not interfere with or

disregard the ability of another tribunal to address it in a different setting. *See Aviva Life & Annuity Co. v. Am. Gen. Life Ins. Co.*, 2014 WL 1677798, at *11 (Del. Ch. Apr. 29, 2014) (holding request for declaratory judgment unripe and noting that resolving request would require court's "application, on an advisory basis, of Treasury Regulations to a situation not yet addressed by the IRS" but explaining that "even if I were to address and decide this issue, my decision would not be binding on the IRS or the federal courts.").

This court has jurisdiction to make factual findings relating to the legitimacy of the NOL as part of its review of Braziel's actions as receiver. The court empowered the Special Magistrate to address those issues in the first instance, giving him jurisdiction over those matters for purposes of preparing the Report. Braziel's contention that the Special Magistrate and the court lacked jurisdiction over those subjects misunderstands the nature of this proceeding.

### 3. The Statute Of Limitations For Challenging The Tax Returns

Relatedly, Braziel argues that the Special Magistrate and this court cannot consider the events surrounding the NOL because the time for the IRS to challenge returns from 2017 and 2018 has passed. Braziel Br. at 24. Here again, Braziel misses the point.

This proceeding is not about—and will not determine—the Company's tax obligations for 2017 and 2018. This proceeding is about whether Braziel took money for himself that belonged to the Company. Evaluating whether the Website Address had a value of approximately $10 million in 2017, as Braziel claimed, is part of the assessment of his self-dealing, not a determination of how much the Company must

28

pay in taxes. The statute of limitations for a challenge to the Company's tax filings has no relevance to this case.

### 4. The Tax Opinion Objection

As his fourth objection, Braziel argues that the Special Magistrate could not properly make any conclusions about the NOL without obtaining a "a tax expert's opinion because of the complex tax questions involved." Braziel Br. at 21. To say it yet again, neither the Special Magistrate nor the court is ruling on the Company's ultimate tax liability. The Special Magistrate made a recommendation, and this court has considered *de novo*, whether the Website Address had a value of nearly $10 million in 2017. That is an issue of fact that does not require special tax expertise.

### 5. Fisher Weis's Signoff

Braziel's only meaningful objection to the Special Magistrate's recommended finding relies on the fact that the Company's former tax preparer, Fisher Weis, approved the NOL. Braziel Br. 22–23. But as the Special Magistrate explains, "Braziel's success leading others to credit a falsity did not make the falsity true." Response ¶ 6. Throughout his communications with Fisher Weis, Braziel manipulated financial documents from the Company and third parties to cover up his actions. Report at 47–48. Put simply, Braziel misled Fisher Weis.

If anything, the record suggests that Fisher Weis had doubts about Braziel's claims. Fisher Weis asked Braziel detailed questions and sought backup, ultimately causing Braziel to discharge the firm. For purposes of the returns that Fisher Weis filed, the firm ultimately demanded and received a representation letter from Braziel in which he took personal responsibility for the contents of the Company's filings. Ex.

29

283. Fisher Weis's willingness to file the Company's tax returns based on that representation letter does not mean that Fisher Weis validated the NOL.

### 6. The Absence Of An Alternative Cost Basis

Finally, Braziel objects that the Report did not recommend an alternative cost basis for the Website Address. Braziel Br. at 27. The court did not charge the Special Magistrate with re-doing the Company's tax filings. The court charged the Special Magistrate with investigating whether Braziel engaged in self-dealing while serving as a court-appointed receiver. To fulfill his charge, the Special Magistrate sought to understand the value of the Website Address and figure out how the NOL related to that value.

For the Special Magistrate's charge, it was sufficient to determine that the value of the Website Address never approached $10 million and that the Company's effort to claim an NOL that incorporated that valuation was not bona fide. Those findings supported the Special Magistrate's recommendation that Braziel acted disloyally during the receivership. The Special Magistrate did not have to recommend a dollar-and-cents finding about actual value. It was sufficient to determine that Braziel overstated the value of the Website Address by an order of magnitude.

\* \* \*

None of Braziel's arguments about the NOL warrant rejecting the Special Magistrate's recommended finding. Having conducted a *de novo* review of that determination and the supporting evidence, the court overrules Braziel's exception and adopts the portions of the Special Magistrate's Report and Response concerning the NOL.

30

## B.        The Fifth Amendment Exception

Braziel next asserts that the Report violated Delaware Rule of Evidence 512(a) by commenting improperly and drawing an inference based on his invocation of the Fifth Amendment privilege against self-incrimination. After examining the record, the court finds that the Special Magistrate did not do that. Regardless, the court has not done that.

Braziel's objection relies on a combination of the Fifth Amendment to the United States Constitution and Delaware Rule of Evidence 512(a). The Fifth Amendment states, in pertinent part, that a person shall not be "compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V. The Supreme Court of the United States has explained that

> the Fifth Amendment not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.

*Baxter v. Palmigiano,* 425 U.S. 308, 316 (1976) (cleaned up). Delaware Rules of Evidence Section 512(a) states: "The claim of a privilege, whether in the present proceeding or upon a prior occasion, is not a proper subject of comment by judge or counsel. No inference may be drawn therefrom." D.R.E. 512(a).

Rule 512(a) applies to any invocations of the Fifth Amendment, even in the setting of a civil case. *A. Schulman, Inc. v. Citadel Plastics Hldgs.*, LLC, 2018 WL 1812575, at *3–4 (Del. Ch. Apr. 15, 2018) (ORDER). "Although, as a matter of federal law, courts presiding over civil actions may draw an adverse inference against a party

31

who invokes the privilege against self-incrimination without violating the U.S. Constitution, . . . Delaware law prohibits courts in this State from doing so." *W.L. Gore & Assocs., Inc. v. Long*, 2011 WL 6935278, at \*4 n.31 (Del. Ch. Dec. 28, 2011); *see also Digiacobbe v. Sestak*, 1998 WL 684149, \*10 (Del. Ch. July 7, 1998) ("I, as the trier of fact, may not draw any inference from [the defendant's] assertion of his Constitutional right not to testify when to do so might incriminate himself.").

Braziel invoked his Fifth Amendment rights during his deposition. Braziel takes exception to three statements in the Report that refer to his invocation of his Fifth Amendment rights, claiming that they contravene Rule 512(a).

### 1. The 500 Times Statement

Braziel first objects to the Report's statement that "Braziel, his business partner, and the receivership's lead attorney testified by deposition, but Braziel's testimony fell short of its potential after he invoked the Fifth Amendment to the United States Constitution over 500 times." Report at 4 (the "500 Times Statement"). To Braziel, the "over 500 times" implies an adverse inference that only someone guilty of something would invoke the Fifth Amendment that often. Braziel Br. at 29–30. He further contends that by saying the "testimony fell short of its potential," the Special Magistrate relied on the invocation of the Fifth Amendment to infer that Braziel's testimony was inadequate. *Id.*

The 500 Times Statement does not reflect an inference of guilt. It rather explains why there were gaps in Braziel's testimony. Any reader of the Report would repeatedly wonder whether Braziel had any explanation for a particular event or commentary on a particular issue. The 500 Times Statement informed the reader

32

that Braziel had not addressed numerous issues, not because the Special Magistrate did not explore them, but rather because Braziel had invoked the Fifth Amendment. That description does not invite an adverse inference; it provides a neutral factual account of what transpired.

In the Response, the Special Magistrate confirmed that he included the 500 Times Statement when describing "how discovery unfolded." Response ¶ 8. He referenced the number of times not to suggest criminality, but rather to document that Braziel was an evasive witness who invoked the Fifth Amendment even "in response to innocuous questions that could not have provoked any confession of criminality." *Id*. This decision therefore overrules Braziel's exception relating to the 500 Times Statement.

### 2. The No Inference Statement

Relatedly, Braziel challenges the following statement in the Report:

> Braziel pled the Fifth when questioned about his acquisition of B.E. Capital's Class A shares in December 2021, but this report has not drawn any inference from Braziel's privilege assertions. On many issues, the documentary evidence all pointed one way, so Braziel's decision not to answer simply was a missed opportunity to raise any contrary evidence that might have existed.

Report at 89 n.99 (citation omitted) (the "No Inference Statement"). Braziel argues counterintuitively that by stating that he was not drawing an adverse inference, the Special Magistrate was in fact seeking an inference that the evidence against Braziel "is so overwhelming that Braziel's decision not to provide exculpatory testimony necessarily mean [sic] he must be guilty of some crime." Braziel Br. at 30–31.

That through-the-looking-glass argument works for conspiracy theorists, but not for exceptions to a thorough and diligent report from a special magistrate. The No Inference Statement means what it says: The Special Magistrate did not draw an adverse inference from Braziel's invocations of the Fifth Amendment. The court will not draw an adverse inference either.

### 3. The Studies Statement

Last, Braziel challenges a third statement in the Report: "On November 15, [2016], B.E. Capital moved for a default judgment naming Braziel as the Company's receiver. The motion emphasized that Braziel was a qualified person who had studied the rules governing receivers of Delaware corporations, but Braziel later pled the Fifth when asked to describe his studies." Report at 15 (the "Studies Statement"). Braziel argues that this statement requests two adverse inferences: (i) Braziel is "untrustworthy because he refused to answer a simple question" and (ii) "Braziel asserted the Privilege because he knows he lied to the Court about studying the rules governing receivers of Delaware corporation." Braziel Br. at 30.

The Studies Statement does not support either inference. The Studies Statement appears is in a section titled "The Company Enters Receivership." It is a neutral and accurate statement that provides historical background. The Report does not use the statement to suggest that Braziel is untruthful or untrustworthy. It describes a fact that is plain from the face of Braziel's deposition transcript. Braziel Dep. 65–66.

The one additional wrinkle is that the Special Magistrate cited the Studies Statement as an example of Braziel's evasiveness in his deposition. Response ¶¶ 8 &

34

8.f. Evaluating the matter under a *de novo* review, the court agrees that in this instance, Braziel did not act reasonably when invoking the Fifth Amendment.

There are limits in a civil case on a litigant's ability to invoke the Fifth Amendment. A witness cannot "avoid interrogation, *in vacuuo,* by merely stating that his answers may tend to incriminate him." *W.L. Gore,* 2011 WL 6935278, at *1 (citation omitted). "Rather, in a civil setting, invocation of the privilege must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer." *Id.* (cleaned up). Thus, "assertions of privilege must be made on a question-by-question basis where the *particular* answer either would support a conviction or furnish a link in the chain of evidence needed to prosecute the witness." *Id.* (cleaned up).

Braziel argues he had a reasonable cause to apprehend danger when the Special Magistrate questioned him about familiarizing himself with the Delaware rules governing receivers. According to Braziel, his answers to those questions could "form a link in the chain necessary to prosecute Braziel for criminal fraud, since an answer that Braziel did not perform the studies relayed to the Court could potentially establish the knowledge and intent elements of criminal fraud." Braziel Br. at 34–35. That is not a reasonable contention. If Braziel did not study the requirements, then by definition he would not have known about them.

Because Braziel represented that he had studied the requirements, Braziel claims he properly invoked the Fifth Amendment because "making a false submission to the Court could constitute an overt criminal act necessary for conspiracy charges."

35

*Id.* at 35. A false statement about reading the requirements for a receivership might warrant a civil sanction. It is hard to envision that statement leading to a criminal sanction.

Braziel did not act reasonably when invoking the Fifth Amendment in response to questions about his efforts to familiarize himself with the law governing receiverships. The Special Magistrate's statements to the same effect, therefore, did not violate D.R.E. 512(a). This decision therefore overrules Braziel's exception based on the Studies Statement.

## C. The Sixth Amendment Exception

In his third exception,[9] Braziel claims that the Special Magistrate procedure deprived him of his "constitutional right to a trial by a jury" because the Report "concludes that the evidence establishes, *prima facie*, the elements of the crimes of theft, forgery, and tax evasion." Braziel Br. at 36–37. That is not so.

The Sixth Amendment states in pertinent part that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ." U.S. Const. amend. VI. To state the obvious, the Report was not a criminal prosecution.

---

[9] Braziel groups his Fifth Amendment and Sixth Amendment exceptions together, resulting in a total of three exceptions to the Report. This decision splits them out for simplicity, resulting in a total of four exceptions. The stylistic change has no substantive effect.

The Special Magistrate used the elements of the crimes of theft, forgery, and tax evasion to analyze whether Braziel should have to pay for the costs of the Special Magistrate's investigation under the bad faith exception to the American Rule. "Generally, under what is commonly known as the American Rule . . . , each party involved in litigation will bear only their individual attorneys' fees no matter what the outcome of the litigation." *William Penn P'ship v. Saliba*, 13 A.3d 749, 759 (Del. 2011) (cleaned up). "One of the well-recognized common law exceptions to the American Rule is the power of a court or an administrative tribunal, otherwise vested with equitable authority, to award attorney's fees when the 'losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Brice v. State of Del., Dept. of Correction*, 704 A.2d 1176, 1179 (Del. 1998) (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258–59 (1975)). For purposes of the bad faith exception, "the fact that a party engaged in conduct which, on its face, would establish a *prima facie* case for violating a criminal statute provides powerful evidence that the party acted in bad faith." *Choupak v. Rivkin*, 2015 WL 1589610, at \*21 (Del. Ch. Apr. 6, 2015), *aff'd*, 129 A.2d 232 (Del. 2015).

The Special Magistrate found that Braziel's conduct rose to the level of bad faith. Relying on *Choupak*, he explained that "by taking from the WSFS Account, falsifying bank records, and inflating the [Website Address's] cost basis on the Company's federal tax returns, Braziel committed conduct that, on its face, meets the elements of crimes that include theft, forgery, and tax evasion." Report at 71 & n. 89

37

(first citing 11 *Del. C.* § 841(a) (elements of theft); then citing *id.* § 861(a) (elements of forgery); and then citing 26 U.S.C. § 7201 (elements of tax evasion)).

By making those observations, the Special Magistrate did not find that Braziel committed those crimes or could be convicted for them. The Special Magistrate made recommended factual findings *in a civil case* to the effect that Braziel's conduct appeared sufficiently egregious to warrant fee-shifting.

After conducting a *de novo* review, this court agrees with the Special Magistrate's recommended findings. To be clear, that is also not a criminal conviction. This court lacks jurisdiction over criminal cases. A prosecutor could not pick up the Report and ask a court to declare Braziel guilty under some bizarre concept of *res judicata*. Nor could a prosecutor do so with this court's decision. Any finding of criminal liability in connection with Braziel's actions would require a prosecution and a trial by jury.

The bad faith analysis that the special magistrate conducted and this court agrees with after *de novo* review looks to the elements of criminal law solely as a navigational aid to determine at what point a party's conduct transitions from merely aggressive to egregious to glaringly egregious. The criminalization of particular behavior provides an indication that the conduct falls towards the more blameworthy end of the spectrum. Whether the party actually committed a crime is not for this court to decide.[10]

---

[10] Consider an analogy: A parent who is not a qualified doctor has no ability to diagnose medical conditions. When evaluating their child's condition, the parent may

After reviewing the matter *de novo*, the court finds that the Report appropriately compared Braziel's conduct to the elements of criminal offenses for the purpose of measuring whether Braziel's actions were sufficiently egregious to require fee-shifting under the bad faith exception to the American Rule. The Report did not violate the Braziel's Sixth Amendment right to a trial by jury, so this decision also denies that exception.

**D.    The Belmond Investment Exception**

Braziel's final exception relates to the Special Magistrate's recommendation that he pay the Company $2,000,726.93 in immediate restitution, representing a portion of the amounts Braziel took from the Company with the associated gains. Braziel argues that he should only have to pay $1,850,726.93, or $150,000 less. For purposes of the immediate award of restitution, the court grants Braziel's exception but only reduces the award by $94,337.06 to $1,945,063.99. At this stage of the case, the court cannot conclude that a greater amount is warranted using the summary judgment standard that the Special Magistrate appropriately recommends.

"Summary judgment is only appropriate where, viewing the facts in the light most favorable to the non-moving party, the moving party has demonstrated that

---

nevertheless look to symptoms associated with known illnesses to determine whether to keep the child home from school, see a doctor, or head to the emergency room. By taking symptoms into account and comparing them with information about illnesses, the parent is not usurping the doctor's task, nor is the parent making an official diagnosis. That is for the doctor to do. But a knowledgeable parent can make a preliminary assessment of the situation. Likewise, a court that does not handle criminal cases can help orient itself to whether particular conduct is egregious by looking at whether society has seen fit to criminalize related types of conduct.

there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Dambro v. Meyer*, 974 A.2d 121, 138 (Del. 2009). The court must deny summary judgment "if there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as to a material fact or the inferences to be drawn therefrom." *Applied Energetics, Inc. v. Farley*, 239 A.3d 409, 425 (Del. Ch. 2020) (quoting *Vanaman v. Milford Mem'l Hosp., Inc.*, 272 A.2d 718, 720 (Del. 1970)). In this setting, Braziel is the non-moving party.

Braziel invested a total of $370,000 into Belmond. The total proceeds generated from the investment were $1,494,337.06. Of the amount invested, $270,000 came from the Company, and $100,000 came from Braziel's father-in-law and brother-in-law. The Special Magistrate proposed to account for the in-laws' investment by seeking interim restitution for the Belmond Investment in the amount of $1.35 million, which assumes that $144,337.06 of the proceeds were attributable to the in-laws' funds. That approach would credit Braziel's in-laws with $1.44 for every $1 they invested.

Braziel challenges the Special Magistrate's allocation. He proposes that the court credit his in-laws with $200,000 from the Belmond Investment, or $2 for every $1 invested.

In reaching his figure, the Special Magistrate recommended a finding that the in-laws largely cashed out by October 2018, before most of the gains materialized in December 2018. Braziel disputes that assessment. He also maintains that once he

40

comingled his in-laws' funds with the Company's, then any future gains or withdrawals must be allocated proportionately.

There are two Restatements of Restitution that address this issue. The Special Magistrate relies on the Third Restatement.[11] Braziel relies on the First Restatement.[12] Since the publication of the Third Restatement in 2011, the Delaware courts have relied on it consistently.[13] There is one Delaware case that applied the First Restatement's rule on co-mingled funds, but that case was decided in 1985, twenty-six years before the Third Restatement was published, and it addresses an issue where the Third Restatement applies the same rule.[14] That decision does not reflect a determination to follow the First Restatement at the expense of the Third.

_____

[11] Restatement (Third) of Restitution and Unjust Enrichment (Am. L. Inst. 2011) [hereinafter Third Restatement].

[12] Restatement (First) of Restitution (Am. L. Inst. 1937) [hereinafter First Restatement].

[13] *E.g.*, *State v. Monsanto Co.*, 299 A.3d 372, 391 (Del. 2023); *Morgan v. Scott*, 2014 WL 4698487, at *2 n.6 & *3 n.12 (Del. Sept. 22, 2014) (TABLE); *Principal Growth Strategies, LLC v. AGH Parent LLC*, 2024 WL 274246, at *12 (Del. Ch. Jan. 25, 2024); *Gener8, LLC v. Castanon*, 2023 WL 6381635, at *31 n.390 (Del. Ch. Sept. 29, 2023); *In re Columbia Pipeline Gp., Inc. Merger Litig.*, 299 A.3d 393, 479 n.37 (Del. Ch. 2023); *Garfield. v. Allen*, 277 A.3d 296, 343 (Del. Ch. 2022); *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 866 (Del. Ch. 2022); *Paul Elton, LLC v. Rommel Del., LLC*, 2020 WL 2203708, at *13 (Del. Ch. May 7, 2020); *Urdan v. WR Cap. P'rs, LLC*, 2019 WL 3891720, at *20 (Del. Ch. Aug. 19, 2019), *aff'd*, 244 A.3d 668 (Del. 2020); *Preferred Inv. Servs., Inc. v. T & H Bail Bonds, Inc.*, 2013 WL 3934992, at *21 n.201 (Del. Ch. July 24, 2013), *aff'd*, 108 A.3d 1225 (Del. 2015).

[14] *See Lomas & Nettleton v. Graybeal*, 1985 WL 44701, *3 (Del. Ch. Apr. 17, 1985) (citing First Restatement and holding that "[t]he fact that defendants may have comingled their own funds with the misappropriated funds does not destroy the identity of the trust property since the funds can be traced to specific purchases-the house and furnishings."); *see also* Third Restatement § 58(1) ("A claimant entitled to

Fortunately, there are only limited differences between the two regimes. As the Third Restatement explains, the rules for tracing commingled funds are consistent "in all respects but one." Third Restatement § 59 cmt. a. That one issue involves how to treat a conscious wrongdoer's share of commingled funds. *Id.*

Under the First Restatement, a claimant who traced assets through a commingled fund into a product of the fund is limited, even against a conscious wrongdoer, to a share of the product "in such proportion as his money bore to the whole amount of the fund." First Restatement § 210(2). Under that regime, which emphasizes the "rule of proportionality," the Company could only recover an amount of gains proportionate to its investment of $270,000. Even if the court determined that Braziel's in-laws were wrongdoers, the Company could not gain a more beneficial allocation.[15]

restitution from property may obtain restitution from any traceable product of that property, without regard to subsequent changes of form.").

[15] *See* First Restatement § 213(1) ("where a person wrongfully mingles money of two or more persons, each of them is entitled to share in the mingled fund or in property acquired with the fund, in such proportion as his money bore to the whole amount of the fund."); *id.* cmt. c ("Where a person wrongfully mingles money of two or more persons and subsequently wrongfully withdraws and dissipates a part of the money, the claimants are entitled to share the balance proportionately. This is true where the wrongdoer deposits the money of two or more persons in a single bank account and subsequently makes withdrawals which he dissipates. It is immaterial in what order the deposits were made, since there is no inference that the money first deposited is the money first withdrawn. The rule in Clayton's Case (see § 211, Comment a) that withdrawals are presumed to be in the same order as that in which the deposits were made, has no application to this situation, where the intention of the wrongdoer in making withdrawals is immaterial.").

Under the Third Restatement, when a wrongdoer is involved, the claimant can "claim the entire advantage of beneficial withdrawals that can be attributed to the claimant's funds (§ 59(2)(a))." Third Restatement § 59 cmt. a. Under this regime, an innocent claimant can identify as the traceable product of his property the whole of any investment made by withdrawal from the commingled fund, "consistent with the limitations of lowest intermediate balance." *Id.* cmt. d. Under that rule,

> [t]he claimant, in effect, is allowed to trace into that portion of the commingled fund (or any withdrawal from the fund) that equals but does not exceed the lowest balance reached by the fund between (x) the point at which claimant's property is added to the fund, and (y) the point at which the withdrawal is made or the fund is apportioned.

*Id.* cmt. a. If the wrongdoer commingled the claimant's funds with his own or another wrongdoer's funds, then "[d]isadvantageous or untraceable withdrawals are attributed to the wrongdoer's funds, to the extent the available balance permits." *Id.* cmt. d.

The Third Restatement's approach is more equitable in that it elevates the interests of an innocent party over the claims of wrongdoers. It also enables a court to adapt the form of relief to the circumstances. In contrast to the single rule for all settings that the First Restatement uses, Section 59 of the Third Restatement "states distinct rules for different categories of cases, depending on the equitable status of the competing parties." Third Restatement § 59 cmt. a.

For purposes of tracing commingled funds under the Third Restatement, the more claimant-friendly rules apply only when "property of the claimant has been commingled by a recipient who is a conscious wrongdoer or a defaulting fiduciary (§ 51) or equally at fault in dealing with the claimant's property (§ 52) . . . ." Third

43

Restatement § 59(2). Someone is "equally at fault" when they were unjustly enriched as a result of "bad faith or reprehensible conduct." *Id.* § 52(2)(c) (citation omitted).

The Special Magistrate recommended a finding that treated the in-laws as wrongdoers under the Third Restatement because they knew at all times that Braziel intended to use the Company's funds to make investments. The evidence supports his proposed finding on knowledge: On December 26, 2017, Braziel emailed his in-laws to follow up on a conversation they had the prior day. Report at 25 (citing Ex. 122). Braziel wrote: "Hey, guys, I was being very serious yesterday about Fund.com Inc [sic] and its ability to house deals. I love the ship management roll-up idea and Fund.com has of course cash (about 1.4m USD currently), but also a public stock to use as currency if you needed for deals." Ex. 122. Braziel attached a bank statement for the Company's account and crowed that it showed a "bank account balance showing 1.4m ready for investment." *Id.*

Based on this recommended finding, the Special Magistrate carefully traced the in-laws funds using the Third Restatement's principles. He then recommended a finding to the effect that Braziel had either withdrawn the bulk of the in-laws funds or invested them unprofitably by the end of October 2018 and that only $9,621.26 of the in-laws' funds remained invested after October. As a result, the Special Magistrate recommended using that figure when determining the in-laws share of the eventual gains.

The Special Magistrate properly applied the Third Restatement's tracing principles. But there is a difference between (i) knowing that Braziel planned to use

44

Company funds to make investments and (ii) knowing that Braziel was not permitted to make investments using Company funds. Under a summary judgment standard, the court cannot conclude that Braziel's in-laws knew the latter. At this stage of the case, the court cannot conclude that Braziel's in-laws engaged in the kind of "bad faith or reprehensible conduct" that qualifies a party as "equally at fault" and subject to the anti-wrongdoer and pro-claimant presumptions of Section 59(2) of the Third Restatement.

If the court could conclude using a summary judgment standard that the in-laws were conscious wrongdoers, then the court would agree with the Special Magistrate and adopt his conclusion. But because the court cannot make the predicate determination, the court cannot—as yet—adopt the Special Magistrate's reasoning on this topic.

But the court also cannot adopt Braziel's alternative amount. Although Braziel argues for applying restitution principles from the First Restatement, he has not provided an alternative amount that follows those principles. Instead, Braziel argues the "best evidence" of his in-laws' portion of the gains from the Belmond Investment is a series of wires totaling $200,000 that he sent from his personal bank account in November and December 2019. Braziel Br. 46–49. After accounting for a $50,000 reduction that the Special Magistrate made in response to Braziel's exceptions,[16]

---

[16] The Special Magistrate's draft report initially omitted a second wire of $30,000 from Braziel's in-laws to the First Brokerage Account. Response ¶ 7.a. In response to Braziel's exception, the Special Magistrate reduced the award by $50,000 to account for the omitted wire and some margin for error. *Id.*; Report at 79 & n.95.

Braziel subtracted the remaining $150,000 from the Report's topline recommended award of $2,000,726.93, to arrive at a revised amount of $1,850,726.93. Braziel Br. at 49. But in focusing on the topline number Braziel misapprehends the Report and overcorrects the award.

Braziel did not take an exception to the Special Magistrate's recommended finding that the Belmond Investment achieved gains of approximately $1,494,337.06. Apportioning $200,000 of that amount to Braziel's in-laws leaves $1,294,337.06 for the Company.

The Belmond Investment accounted for $1,350,000 of the Report's recommended award. Replacing that figure with the $1,294,337.06 apportionment implied by Braziel's exception results in a revised award of $1,945,063.99. That revised award exceeds Braziel's proposed figure of $1,850,726.93 by $94,337.06.

The $94,337.06 delta derives from Braziel's apparent misunderstanding of the Report's calculation. The Report's recommended amount of $2,000,726.93 addressed multiple investments that Braziel made using the Company's money. Report at 78–84. Braziel only took exception to the portion of the award for the Belmond Investment, so only that $1,350,000 is at issue. Reducing that portion of the award by $150,000 attributes $1,200,000 to the Belmond Investment. The tables below compare the calculations:

| Restitution Award (The Court) | | Restitution Award (Braziel) | |
|---|---|---|---|
| Belmond Investment | $1,294,337.06 | Belmond Investment | $1,200,000.00 |
| Kingsway Investment | $63,447.55 | Kingsway Investment | $63,447.55 |
| The Mt. Gox Claims | $465,307.21 | The Mt. Gox Claims | $465,307.21 |
| The Ricci Loan and the Orbital Investment | $121,972.17 | The Ricci Loan and the Orbital Investment | $121,972.17 |
| **Total** | **$1,945,063.99** | **Total** | **$1,850,726.93** |

Reducing the Belmond Investment component by $150,000 goes too far. Recall that the total proceeds from the Belmond Investment were $1,494,337.06. Braziel's apportionment of $1,200,000 of those proceeds to the Company implies an apportionment of $294,337.06 to his in-laws. But that apportionment allocates $94,337.06 more to his in-laws than the $200,000 that Braziel asserts his in-laws received. Using Braziel's figure would therefore save him $94,337.06 that he necessarily acknowledges that he owes.

Further proceedings will be necessary to determine the precise allocations for the Belmond Investment. For purposes of the immediate restitution award, Braziel has overstated the amount in dispute by $94,337.06. Correcting Braziel's overstatement results in a decreased award for the Belmond Investment of $1,294,337.06, and a reduction of the overall award to $1,945,063.99. This decision therefore grants Braziel's exception, but only reduces the award to $1,945,063.99.

The court's granting of Braziel's exception avoids the need to consider his other arguments against the Special Magistrate's recommended amount. On the issue of restitution, this decision stops here.

## III. CONCLUSION

As to the issues where Braziel takes no exception, the court adopts the proposed findings and recommendations set forth in the Report. As to issues where Braziel took exceptions, this decision overrules all but the exception relating to the Belmond Investment after conducting a *de novo* review. This decision grants Braziel's exception regarding the allocation of proceeds from the Belmond Investment but does not adopt Braziel's proposed alternative immediate restitution award. Instead, the court reduces the award to $1,945,063.99.

This decision discharges Braziel as receiver but without any limitation on his potential liability for actions taken in that capacity. The court retains jurisdiction over Braziel for purposes of further proceedings.

Within twenty days, Braziel must pay the Company restitution in the amount of $1,945,063.99, plus post-judgment interest at the legal rate compounded monthly.

Braziel must pay the fees and expenses of the Special Magistrate. If the parties cannot agree on an amount, then the Special Magistrate will file an appropriate motion.

Within thirty days, the Special Magistrate will identify three individuals who are qualified and willing to serve as successor receivers. The court will select one. The new receiver can then determine how to proceed, including whether to pursue additional claims against or remedies from Braziel.

Within ten days, the Special Magistrate will submit an order, on notice to Braziel, implementing these rulings.